(No. 13359.—Reversed in part and remanded.)

THOMAS E. DORIAN, Appellee, *vs.* CATHERINE DORIAN *et al.* Appellants.

*Opinion filed April 21, 1921—Rehearing denied June 8, 1921.*

1. DIVORCE—*dismissal of charge of adultery after jury has retired is not prejudicial to defendant.* In a proceeding for divorce on the ground of habitual intoxication and of adultery, a dismissal of the charge of adultery, on motion of the complainant, after the jury has retired, cannot injure the rights of the defendant and is not prejudicial error.

2. SAME—*statute does not require abandonment of husband or wife who is habitually intoxicated.* To be entitled to a divorce on the ground of habitual intoxication a husband is not required to abandon his wife or a wife her husband because of the other's intoxication; nor does the statute require that the habitual drunkenness continue for two years after cohabitation has ceased, as condonation of such offense is not to be presumed from cohabitation.

3. SAME—*instruction may define habitual drunkenness without reference to time when it occurs.* In a proceeding for divorce on the ground of habitual drunkenness, an instruction which merely undertakes to tell the jury what constitutes habitual drunkenness is not erroneous because it makes nô reference to the time when such habitual drunkenness must be shown to have occurred in order to be ground for divorce.

4. SAME—*continuous intoxication is not necessary to constitute habitual drunkenness.* Intoxication without intermission is not necessary to constitute habitual drunkenness as a ground for divorce, and the fact that for a portion of the two years preceding the filing of the bill the defendant was not intoxicated because she could not get intoxicating liquor and that for short periods she voluntarily abstained does not show that she was not guilty of habitual drunkenness during such time, where the evidence is conclusive that the defendant's habit of intoxication was never reformed.

5. SAME—*a decree canceling trust deed must be based on the evidence.* The fact that the defendant in a divorce proceeding is found guilty of habitual drunkenness and that at the time of the trial she was mentally weak from excessive use of liquor is not ground for setting aside a trust deed made by her two and one-half years before the trial, where there is evidence that she was not intoxicated at that time and no evidence that she was intoxicated or mentally incompetent.

APPEAL from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

THOMAS E. SWANSON, EDWARD B. CARON, and STANLEY S. SCHAFFER, for appellants.

A. L. GETTYS, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Thomas E. Dorian filed a bill for divorce in the superior court of Cook county on August 28, 1917, against his wife, Catherine, charging her with having been guilty of habitual drunkenness for the space of more than two years, and with adultery. The bill contained allegations in regard to the title to certain real estate and certain conveyances thereof and to certain incumbrances thereon held by James E. Callahan and Charles P. R. Macaulay, and besides praying for a divorce prayed for the cancellation of these conveyances and incumbrances. Mrs. Dorian having answered the bill, the cause was tried by a jury, and on January 30, 1918, a verdict was rendered finding her guilty of habitual drunkenness for a space of two years prior to the filing of the bill of complaint and subsequent to the marriage. She made a motion for a new trial. Afterward the complainant filed a supplemental bill in relation to the real estate, which was later amended, and answered. The cause was then heard upon the amended supplemental bill, answers, replications and evidence, and on January 29, 1920, a decree was entered overruling the motion for a new trial, granting a divorce to the complainant and also granting the relief prayed for in regard to the real estate. The defendants have appealed from this decree.

It is not necessary to discuss the evidence in regard to the divorce for it was amply sufficient to sustain the verdict, but counsel argue that there are errors in the record which require a reversal of the decree of divorce.

After the jury had retired to consider their verdict they returned into open court and inquired whether they could find the defendant guilty on the charge of drunkenness and not guilty on the charge of adultery and whether in such case the complainant could have a divorce, but the court, without answering the question or giving any instruction, ordered the jury to retire again. After they had done so, the court, on the complainant's motion, over the defendant's objection, granted him leave to amend the bill by striking out the charge of adultery. The court thereupon instructed the jury that the charge of adultery had been withdrawn, the bill amended by striking out that charge, and the jury need not render a verdict on it. It is insisted that this was error, for the reason that the complainant had no right, as it is said, to take a non-suit after the jury had retired, and that this action should have resulted in the dismissal of the bill. Whatever may have been the right of the complainant as to amending or dismissing his bill as to the charge of adultery, the dismissal could not have injured the defendant, and it was not prejudicial error for the court to allow it.

The parties were married in 1897 and no complaint is made of the wife's conduct during the early part of her married life, but about 1910 the evidence shows that she had acquired the habit of intoxication, which she has never abandoned. Her husband lived with her until 1917. In May, 1917, he was sentenced to the house of correction for a failure to pay $40 a month which he had been required to pay for the support of his children. He was released in August and soon after filed his bill for divorce. It is insisted that the bill, with the charge of adultery eliminated, is without equity on its face; that habitual drunkenness is not a cause for divorce unless it has continued for two years after cohabitation has ceased. The statute makes no such requirement. Habitual intoxication is not like the other causes of divorce, adultery, cruelty, desertion or con-

viction of a felony, in which specific acts furnish the ground for divorce. The habit of intoxication is formed gradually. There is ordinarily no definite time when the habit may be said to have begun. A husband is not required to abandon his wife or a wife her husband for intoxication once or many times. Even after the habit has been formed there may be reformation, and forbearance is not to be discouraged by a rule under which the husband or wife who has endured the burden of a drunken spouse even for an unreasonable time, until it has become unbearable, should still be bound for two years after separation, though the habitual intoxication has long exceeded the time fixed by the statute. For the same reason condonation of the offense is not to be presumed from cohabitation.

At the beginning of the trial the court ordered the witnesses excluded from the court room when not testifying. The defendant's counsel called a witness, and objection was made to his testifying because he had been sitting in the court room. The court sustained the objection and told defendant's counsel to call the next witness. Counsel undertook to explain, but the court repeated the direction to call the next witness. Counsel persisted in his effort to explain, and a colloquy ensued between court and counsel, at the end of which the court directed counsel to proceed with the case, and the counsel stated he wished to except to the court's remarks, whereupon the court directed the clerk to enter a fine of $25 against counsel. We are not asked to review this action of the court, but it is argued that it was prejudicial to the defendant because of the effect of the court's attitude on the jury and of the intimidation of her counsel. On this record we do not find that the defendant was prejudiced by this occurrence.

Objection is made to an instruction given at the request of the complainant, that under it the defendant might have been found guilty of habitual drunkenness for two years early in her married life though she had been sober ever

since. The instruction merely undertook to tell the jury what constituted habitual drunkenness, and no objection is made to it in this respect. It had no reference to the time such habitual drunkenness must be proved to have occurred.

Instructions were asked by the defendant based on the hypothesis that the complainant caused or consented to the habitual drunkenness of the defendant and were properly refused because not based on the evidence. There was evidence that beer was brought home by the complainant and used in the family but not of its immoderate use. It was whisky which made the defendant drunk, and the supplying of beer for use in the family would not justify the giving of these instructions.

During the two years preceding the filing of the bill the defendant was confined in the House of the Good Shepherd for two periods, amounting in the aggregate to nine months. During each of these periods she could not, and each time after she was released for a short time she did not, use intoxicating liquor. From this it is argued that she was not guilty of habitual drunkenness during the two years preceding the filing of the bill. The fact that for a portion of the time she was not intoxicated because she could not get any intoxicating liquor and that for short periods she voluntarily abstained does not indicate that she was not guilty of habitual drunkenness during the time. Intoxication without intermission is not necessary to habitual drunkenness, and the evidence is conclusive that the defendant's habit of intoxication was never reformed. An instruction based on the hypothesis that these periods of abstention constituted reformation was properly refused.

The original bill and the amended supplemental bill allege, in substance, that the complainant is the equitable owner of two parcels of real estate,—the one situated on North Racine avenue, the other on South Marshfield avenue, in Chicago,—but that the legal title to such real estate is in Catherine Dorian, and prays that the premises be con-

veyed to the complainant and that various incumbrances on them be canceled.

The Racine avenue property is improved by a six-flat building. It is worth $20,000, has a rental value of $250 a month and is incumbered by three mortgages, amounting to $11,000. On April 23, 1913, the complainant had the title, and being in urgent need of $300 borrowed that sum of Jerome P. Bowes, who was unwilling, because of the previous mortgages, to lend it on a mortgage but wanted the rents also. Accordingly the complainant and the defendant on April 26, 1913, conveyed the premises by quit-claim deed to Martha V. Cottle, Bowes' sister, who furnished the money for the loan. Soon afterward Mrs. Dorian went to Bowes, offered to pay him the $300 and wanted a deed of the premises, but Bowes refused to have the deed made to her. Afterward Dorian came in, and Bowes told him of Mrs. Dorian's wanting him to give her the deed securing the loan, and on May 8, 1913, Mrs. Cottle conveyed the premises to Mrs. Dorian by quit-claim deed. Mrs. Dorian collected the rent for four years, and testified that in 1916 she collected $2500 rent. Mrs. Dorian testified that Dorian afterward made a quit-claim deed of the property, which was put into a vault, but the vault was broken into and the contents, including her watch and diamond rings, besides the deed, were stolen. Dorian denied making any deed to her. The property was conveyed to Dorian in March, 1908, for what consideration does not appear. Four lots, known as the Douglas Park property, which cost $2000 and were owned jointly by Dorian and his wife, were conveyed in concluding the transaction. Mrs. Dorian testified that she thought the deed was made to her,—that Dorian told her so; but he denies this and says the deed was read to her. Afterward, on October 12, 1915, he filed a sworn petition in the probate court for the appointment of a conservator for her, in which he stated that she owned this property by virtue of a quit-claim deed from him. He

also made an application on April 23, 1917, for release
on probation in the proceeding in the municipal court to
compel him to support his children, in which he stated
that he did not own and was not interested in any real or
personal property. The complainant's explanation of these
statements is that he meant that he had no property in his
own name. The appellants also introduced an affidavit filed
in this cause on December 11, 1917, in which he stated that
he had been advised by his counsel that since he had deeded
his property to his wife he had no remedy, until he retained
his present counsel, who advised him that he could not only
apply for a divorce from his wife, but could also, upon
a proper showing, obtain the property.

The Marshfield avenue property was purchased on No-
vember 12, 1915, for $3000,—$500 cash, $1500 by the pay-
ment of a mortgage then on the property, and the remain-
der in payments of not less than $15 a month. Upon pay-
ment of the consideration the property was to be conveyed
to Kitty Dorian, the defendant. The complainant testified
that all the money paid on this contract was his money,
and the title was taken in his wife's name because he was
then engaged in the roofing business with a partner whose
honesty he suspected and through whom he feared he might
become financially involved.

Mrs. Dorian testified that she was nineteen years old
when she was married; that she went to work in the Bos-
ton Store when she was eleven years old and worked there
until she was married, beginning as a cash girl at $2.50 a
week; that her wages for the whole eight years averaged
from $20 to $25 a week from salary and percentage, and
that when she quit she had $2000 or $3000, which she car-
ried around on her body. The testimony of her husband
and her sister contradicted her by her statements to them
as to her wages, which were not over $9 a week. She also
testified that she made some money after her marriage,
buying and selling and in telling fortunes,—$18 or $20 a

week or month, according to the people and price she could get,—and that some of her property went into each of the properties.

The decision of the issues on the supplemental bill depended upon the credibility of the witnesses and the weight to be given to their testimony. The testimony of the complainant and his wife was directly contradictory. He was corroborated to some extent by the testimony of Margaret Torpey, his wife's sister. The defendant's testimony was not corroborated, and on its face a part of it seems improbable. The chancellor saw the witnesses and had a better opportunity to judge of the amount of credit which should be given to them, respectively, than we have. We cannot disturb his findings in regard to the title of the property or relative claims of the complainant and his wife. They seem to us to be in accordance with the evidence.

In regard to the appellant Macaulay the case is different. He was an attorney who had represented Mrs. Dorian in the municipal court and probate court, and on July 20 she executed a mortgage to James E. Callahan, as trustee, to secure her promissory note for $500, payable to Macaulay one year after date, and also several checks signed by her, amounting to $450. He testified in regard to the services he had performed and the circumstances under which they had been rendered and the services that he contracted to perform at the time the trust deed was given, and testified that they were reasonably worth $1000. There was no contradiction of this testimony. The decree was based on the finding that Macaulay was charged with notice that the property was claimed by the complainant to belong to him. The court made a finding "from the evidence and from observation of the defendant, Catherine Dorian, that she is mentally weak from the effect of drinking liquor; that she was not in a proper state of mind when she signed the notes and trust deed for Macaulay, her attorney, but obediently signed them at his request after they were pre-

pared by said Macaulay. The court finds that on July 20,
1917, or at the time the said trust deed and note secured
by it to said Macaulay was executed by the said Cather-
ine Dorian, she was intoxicated and in such a condition of
mind that she was not competent and capable of executing
said trust deed to the said Callahan and the said note exe-
cuted to said Macaulay secured by it, and for this reason
both instruments are void and without effect so far as it
affects the title to said described property and the complain-
ant." This finding is not sustained by the evidence. The
only testimony in regard to the execution of the mortgage
is that given by Macaulay and Mrs. Dorian at the time it
was executed. Mrs. Dorian was confined in the East Chi-
cago avenue police station, having been arrested for non-
support of the children. Macaulay was not permitted to
testify to what was said at that time, but he testified that
Mrs. Dorian was not intoxicated; that after their con-
versation he took out the trust deed and notes and she
signed the notes and he filled out the trust deed; that he
discovered that he had spoiled one of the notes by writing
his name in the wrong place, and he had some checks that
Mrs. Dorian had given him for $450, therefore he made
the trust deed to secure the one $500 note and the checks.
The notes were signed in the police station. The next
morning Mrs. Dorian was brought into court and dis-
charged. She then went to Macaulay's office and acknowl-
edged the trust deed before a notary public, who testified
that she was not intoxicated at that time. Macaulay had
told Mrs. Dorian that in his opinion Dorian could be re-
leased from his imprisonment in the house of correction
by *habeas corpus* proceedings, and agreed with her that
if Dorian would sign the trust deed Macaulay would per-
form services for him. Macaulay testified that he saw
Dorian in the house of correction the next day after Mrs.
Dorian signed the notes and before she acknowledged the
trust deed and told him of his agreement with Mrs. Do-

rian, and that Dorian told him he would think it over, and asked Macaulay to go out again and see him. Dorian testified that he told Macaulay at that time that he was the owner of the property, but Macaulay testified that Dorian said nothing about it. When Macaulay had first been employed by Mrs. Dorian in the proceeding in the probate court for the appointment of a conservator for her, on examining the files he found Dorian's petition alleging that Mrs. Dorian was the owner of the property by deed from him, and there is no evidence that he ever had any notice that this was not a correct statement of the title except Dorian's testimony that he told Macaulay, when Macaulay visited him in the house of correction, that the property belonged to him. Mrs. Dorian testified that she had been arrested several times and that Macaulay had acted as her attorney and that she employed him and agreed to pay him, and that she did not sign any papers when she was intoxicated, and she was not intoxicated when she acknowledged the trust deed. The court could judge of the credibility of the witness from her appearance on the stand and of her mental capacity, but her appearance in the month of January, 1920, when the case was tried, was certainly no evidence that on July 20, 1917, when the trust deed was executed, she was intoxicated, or that she was then in such a condition of mind as not to be competent and capable of executing the trust deed, or that she obediently signed the notes and trust deed at Macaulay's request. These are questions that must be decided on the evidence as to what occurred at the time and not by the appearance of witnesses two years and a half later.

So far as this part of the decree is concerned it must be reversed. In all other respects the decree will be affirmed, but as to Macaulay and Callahan it will be reversed and the cause will be remanded, with directions to dismiss the supplemental bill as to them without prejudice.

*Reversed in part and remanded, with directions.*