(No. 30869.—

STELLA M. VESOLOWSKI, Appellee, *vs.* CHARLES
VESOLOWSKI, Appellant.

*Opinion filed March 24, 1949—Rehearing denied May 11, 1949.*

CAPLOW & KELLEY, (C. A. CAPLOW, of counsel,) both of Chicago, for appellant.

POSANSKI, BARON, JACOBS & WALTER, of Chicago, (ROMAN E. POSANSKI, and LEON KESSLER, of counsel,) for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

In July, 1947, the plaintiff, Stella Vesolowski, brought an action for divorce in the city court of Calumet City against her husband, Charles Vesolowski, charging desertion and habitual drunkenness and alleging special equities in the property of the parties. Subsequently, the cause was transferred to the superior court of Cook County. In addition to answering the complaint, defendant filed a counterclaim for the partition of real property and for an accounting and the appointment of a receiver for a tavern business. Plaintiff denied her husband's ownership of the tavern business and the cause was referred to a master to be heard on all matters except the issue of divorce. The master found for plaintiff generally and all exceptions to the master's report were overruled by the chancellor. After hearing evidence on the issue of divorce, the chancellor entered a decree dissolving the marriage on the ground of habitual drunkenness; declared plaintiff the owner of the family automobile by virtue of an assignment from defendant in 1946; awarded the tavern business to plaintiff as the legal and equitable owner; declared plaintiff to be the equitable owner of the tavern real estate, acquired by the parties as joint tenants, and ordered defendant to execute a quitclaim deed to this property, and awarded a partition of the family residence, owned by the parties as tenants in common, defendant to be entitled to a one-half interest in the property free and clear of an existing mortgage on the premises.

Defendant does not seem to deny that he was guilty of habitual drunkenness during the two years prior to his commitment to Elgin State Hospital but contends that the divorce decree is erroneous because the complaint, filed in July, 1947, charges him with habitual drunkenness for the space of two years "just prior to the commencement of this suit" and the proof shows that he was confined at Elgin State Hospital for all but the first four or five months of this two-year period. Reading the allegation of drunkenness as a whole, it is clear that the complaint charges habitual drunkenness subsequent to the marriage and for more than two years prior to the institution of divorce proceedings. In our opinion, the complaint sufficiently alleges habitual drunkenness for more than two years prior to July, 1947, including the years 1943 and 1944.

An examination of the complaint reveals it charged that the defendant, after the marriage, "commenced excessive use of intoxicating liquors and has since and just prior to the commencement of suit been guilty of habitual drunkenness for a space of more than two years." Section 1 of the Divorce Act, (Ill. Rev. Stat. 1947, chap. 40, par. 1,) in part, provides: "In every case in which a marriage has been, or hereafter may be contracted and solemnized between any two persons, and it shall be adjudged, * * * that either party * * * has been guilty of habitual drunkenness for the space of two years; * * * it shall be lawful for the injured party to obtain a divorce and dissolution of such marriage contract." The charge in the complaint adequately alleges habitual drunkenness and the only question to be decided on this issue is whether the decree entered on that basis is contrary to the weight of the evidence.

The record relative to the divorce discloses the parties were married February 2, 1921; that two children were born, one being of the age of twenty-five years and the other, seventeen years, at the time of the trial; that after

the marriage defendant progressively became more addicted to the use of liquor until during the years 1943 and 1944, he was habitually drunk; that on the petition of plaintiff the county court of Cook County adjudged defendant mentally ill as a result of alcoholism and committed him to the Elgin State Hospital; that later, in May, 1946, he was released and placed in the custody of plaintiff; that he resumed his habits of drunkenness which necessitated his being returned to the hospital in November, 1946, when he was released as restored.

As to his sobriety after restoration, two witnesses testified that they had observed defendant on several occasions during the summer of 1947 in a condition of drunkenness. From this testimony it is apparent the defendant's habit of intoxication was never reformed. (*Dorian* v. *Dorian,* 298 Ill. 24.) Evidence of intoxication without intermission is not necessary to prove habitual drunkenness. *Holmstedt* v. *Holmstedt,* 383 Ill. 290.

The evidence here discloses a history of drunkenness on the part of defendant extending over a period of many years, progressively growing worse, until his mind was affected and he was committed to the State Hospital. It is undisputed that after treatment in the hospital and he was released on probation, he continued his habits of drunkenness and had to be re-confined; that after again being confined and released he continued to drink and there was no change in his habits as an habitual drunkard. Under this state of the record we are of the opinion the evidence clearly and manifestly preponderates in favor of the plaintiff and she is entitled to a dissolution of the marriage.

Defendant, however, is principally interested in the decretal provisions disposing of the property rights of the parties. A review of the evidence adduced at the master's hearing thus becomes necessary. According to defendant, following his marriage to plaintiff in 1921, he worked as an automobile mechanic. About three years later, he and

his wife went into the grocery business and, about 1938, he started a tavern business directly across the street from the grocery store. Defendant testified that he operated both places and his wife assisted in the grocery business. About two years later, the grocery business was sold and he then purchased improved commercial property at 136 156th Street, Calumet City, with funds accumulated from the grocery and tavern businesses and his State and Federal bonuses, and removed the tavern to the new location. Defendant added that, prior to the acquisition of the tavern property, he purchased the residence at 26 156th Street, Calumet City, also from the profits of both businesses. Maintaining that he operated the new tavern from the time he bought the property until he was committed to Elgin State Hospital, defendant stated his wife helped out only two days a week but that he turned over the weekly receipts to her and she managed the savings. Testifying he had received none of the profits from the tavern business after January, 1945, defendant stated that, following his discharge from the hospital in 1947, plaintiff would not even permit him to enter the tavern. From the deeds and accompanying revenue stamps, it appears that the parties purchased the residence as tenants in common in July, 1941, for a little over $6000 and, in July, 1944, acquired the tavern property as joint tenants for a consideration of $5000.

Although defendant called his wife as an adverse witness, her testimony relative to their business operations and transactions added little or nothing to his case. The balance of her testimony related to the profits of the tavern after January, 1945, and the son of the parties, Charles, Jr., in his capacity as bartender, and another bartender employed by plaintiff, also testified in this same connection relative to the issue of an accounting. In substance, this evidence consisted of joint income-tax returns prepared by plaintiff for the years 1945 and 1946, showing the total

profits of the tavern for the two years to be no more than a few hundred dollars; daily statements of cash receipts and disbursements for the tavern business for twenty-seven days during April and May, 1947, and the record books for the same period, disclosing a uniform reduction in cash receipts of at least $20 a day. Plaintiff sought to explain this discrepancy by saying that the difference represented sums expended for "treating" customers and buying benefit tickets. The son Charles testified that the difference represented refunds paid out in the large package-goods trade conducted by the tavern.

The only other witness for defendant was a former baker who stated he had known the parties since 1931; that he sold them bakery goods every day when they were in the grocery business; that defendant and his wife operated the grocery together; that he visited them about once a week at the old tavern, and that, in 1944, he stopped at the new tavern one time and defendant served him a drink.

Plaintiff, to sustain her allegations of special equities in the tavern business and real properties, gave the following comprehensive testimony, supplying details where necessary. From 1921 to 1927, her husband never held a steady job but worked in garages off and on. In 1927, she borrowed $500 and bought the grocery store for $1500, paying the balance of the purchase price from profits earned in the first year. Defendant began to assist her in the business in 1928. When the tavern was acquired in 1935, at first, defendant operated the new business while she remained at the grocery store. Defendant was not successful at the tavern and they exchanged positions. Defendant was also a failure in operating the grocery store alone and the business had to be sold. According to plaintiff, after 1936, defendant appeared at the tavern but did not do much work and, while he sometimes washed dishes and cleaned up, he never tended the bar and spent most of his time drinking, entertaining and having a good time. The tavern

license was in defendant's name until May, 1945, and he always took custody of the cash income of the business.

Plaintiff further testified that her husband had been "steady drunk" since 1942 and had never given her any real assistance at the tavern. She ran the business from April, 1943, through January, 1944, when she quit because defendant was so disagreeable. Defendant then operated the tavern until the end of March, 1945, when he decided to close the business. Plaintiff became seriously ill in March, went to Rochester, Minnesota, for an operation in May and recuperated at home during the month of June. She related that defendant sold the stock in trade of the old tavern for an unknown sum and that she never saw any part of the proceeds of the sale. The purchase of the tavern property at 136 156th Street was decided upon before she departed for Rochester, Minnesota, in May. She withdrew all their savings, which, together with the proceeds of the sale of the stock in trade, amounted to about $3000, and out of this a down payment of $2000 was made on the new tavern building. The balance of the total purchase price of $5000 was paid from the proceeds of a subsequently executed mortgage loan for $3000 on the property. Plaintiff left the remaining savings of $1000 with her husband and, in addition, they borrowed $3000 on their house to make improvements on the newly acquired property and for other purposes. Defendant was supposed to arrange for the necessary repairs and improvements and prepare for the opening of the tavern. When plaintiff returned from the hospital in June, she found that the work had progressed but little and the money was all gone. Taking a hand in matters, she opened the new tavern early in August and, thereafter, defendant performed no work in connection with the business. In starting the new tavern, plaintiff was faced with two mortgage debts, each for $3000, a liquor bill for $1100, and unpaid debts for a new furnace and new flooring in the tavern, totaling $925, which her hus-

band should have paid from the proceeds of the loan on the house. Plaintiff also testified that, during the latter part of 1944, her husband's drinking became so bad that he was hospitalized several times and, finally, in January, 1945, she filed a petition in the county court alleging that he was mentally ill as a result of alcoholism. She added that, against the advice of his doctors, she had defendant released from Elgin State Hospital in May, 1945; that he was drunk the entire six months he was home, and that, in November, 1945, she had to return him to the hospital. At the time of the hearing in October, 1947, the mortgage indebtedness on the house and tavern had been reduced to $2059 and $1780, respectively. In addition, plaintiff had paid for the flooring and the furnace in the tavern, the old liquor bill of $1100, had maintained both the house and the tavern, and had supported the family during the intervening years.

Three patrons of the tavern testified for plaintiff. Edward Heckler stated that he visited the old tavern for a few minutes six days a week from 1942 until it was closed in 1944; that defendant never waited on customers and did not pay much attention to business; that plaintiff and the bartenders took care of the trade, and that defendant was almost always under the influence of liquor, speaking loudly and arguing. During 1942 and 1943, Peter Gindl visited the tavern on the average of twice a week and stopped at the new tavern about three times a week. He testified that, generally, he saw defendant sitting at the bar; that about half the time defendant was noisy and boisterous and that, while he had no opinion as to whether defendant was drunk or sober, he knew "he was irrational anyway." Joseph Czechanski related that he visited the tavern about eight or ten times a year in 1943 and 1944; that he frequently saw plaintiff serving customers; that defendant usually was drinking and playing cards, and that defendant was drunk about half the time. In addition,

plaintiff's son Robert testified that he spent some time in the tavern from 1942 to 1944; that his father worked there and tended the bar when the bartender had a day off, and that his father was drunk most of the time.

In rebuttal, defendant testified that he received about $2400 upon the death of his parents in 1935 and this money was used to purchase the original tavern business; that the tavern was always run by bartenders; that until the grocery was disposed of he operated and worked in both the tavern and grocery business, and that, with specific reference to the year 1943, he worked hard at the tavern, purchased supplies, served customers, washed dishes, scrubbed floors, took care of the basement and did whatever was required. He stated that his wife assisted him in 1943, principally in cooking fish fries, helping tend the bar and aiding him in the preparation of food. Defendant also maintained that he worked continuously in 1944. As to the $3000 loan on the family residence, defendant did not recollect how much he received directly but stated he used $1000 to pay for the expenses of his wife's illness and that the new furnace and floor in the tavern were paid for out of the loan.

Maintaining that the provisions of the decree relative to the disposition of property rights are contrary to the manifest weight of the evidence, defendant relies upon the familiar rule that the findings of the master are advisory only, that the facts are found by the chancellor, and that, where the chancellor had no better opportunity to judge the credibility of the witnesses than has this court on appeal, all the facts are open for our consideration. (*Kosakowski* v. *Bagdon,* 369 Ill. 252; *Thatcher* v. *Kramer,* 347 Ill. 601.) The ultimate and final question in this court is whether the decree rendered by the chancellor was the proper one under the law and the evidence. *Jones* v. *Koepke,* 387 Ill. 97; *Checlik* v. *Koletsky,* 311 Ill. 433.

Defendant objects particularly to the findings that his operation of the tavern in February and March, 1944, caused the business to collapse and that plaintiff, alone, purchased the new tavern after she recovered from her illness in June, 1945, and established the present tavern business. While it appears that the findings of fact overstate the evidence, it is equally apparent that a more accurate statement of the ultimate facts will avail defendant nothing. As we view the record, plaintiff established the grocery business and defendant started the tavern and each business continued and was successful only through the joint efforts of the parties, until such time as defendant's increasing addiction to liquor made him almost valueless to the tavern business. In March, 1944, the parties mutually agreed to close the old tavern and, about the same time, they decided to purchase the business property at 136 156th Street. With $2000 received by defendant from the sale of the stock in trade of the old tavern, $1000 in savings and the mortgage loan of $3000, the parties had $6,000. Of this sum, $2000 was paid down on the tavern property, and roughly $1000 for plaintiff's medical and hospital expenses. The remainder was all entrusted to defendant, was not invested in the new tavern and is not accounted for other than the $550, which defendant must have paid at the time the new tavern property was purchased. Other than arranging for certain repairs and improvements, defendant contributed no labor or service to the establishment and operation of the new tavern and his ever-increasing drunkenness took him to several hospitals in the latter part of 1944 before he was finally adjudged mentally ill and committed to Elgin State Hospital. In summary, the evidence preponderates in favor of plaintiff's ownership of the tavern business and whatever small interest defendant had in the tavern property is adequately compensated for by allowing him a one-half interest in the residence, free and clear of

the existing mortgage indebtedness. To the extent that it disposes of the respective property rights of the parties in the tavern business, tavern property and residence, the decree is correct.

The remaining contention of defendant is that the court improperly awarded the family automobile to plaintiff. The evidence discloses that defendant purchased the automobile in his own name in 1941. The certificate of title to it discloses an assignment to plaintiff signed by the defendant and dated December 7, 1946. Plaintiff testified the assignment was actually made in 1944. Defendant testified it was not signed by him at all. The notary's certificate shows the date to be December 7, 1946, and in view of the unsupported conflicting evidence the notary's certificate must prevail. (*Gritten* v. *Dickerson,* 202 Ill. 372.) The defendant having been adjudged mentally ill in January, 1945, and there being no showing that he was not mentally ill in December, 1946, the assignment was voidable on his restoration. (*Brandt* v. *Phipps,* 398 Ill. 296.) Defendant exercised his right to rescind the contract within a reasonable time. His counterclaim filed August 7, 1947, contained allegations of his ownership of the automobile, consequently the assignment of title should have been set aside as null and void. As between plaintiff and defendant, defendant is the rightful owner of the automobile and the decree must be reversed and the cause remanded for the sole purpose of correcting this error.

In view of what we have heretofore pointed out, the decree of the superior court is reversed, and the cause remanded, with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded, with directions.*