*In re* D.M. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Betty M., Respondent-Appellant).

Third District    No. 4—97—0982

Opinion filed August 17, 1998.

---

Philip M. Pollock, of Peoria, for appellant.

Kevin Lyons, State's Attorney, of Peoria (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Susan K. Lucas, of Peoria, guardian *ad litem*.

PRESIDING JUSTICE HOMER delivered the opinion of the court:

The respondent, Betty M., appeals the trial court's determination that she is an unfit parent and its subsequent decision to terminate her parental rights. We affirm.

## FACTS

Betty M. is the biological mother of four children: P.W., born July 1, 1991; D.M., born February 16, 1993; W.M., born July 1, 1994; and L.L., born December 20, 1996. This appeal involves the termination of Betty's parental rights to D.M., W.M., and L.L. Her parental rights to P.W. were terminated in previous proceedings and are not the subject of this appeal.

On September 20, 1994, D.M. and W.M. were adjudicated neglected. 705 ILCS 405/2—3(1)(b), (c) (West 1994). The petition for neglect was based upon the following allegations, which were admitted by Betty: that in 1993, Betty had been found unfit to parent her first child, P.W., she had not been subsequently found fit, and her parental rights to P.W. were terminated; that W.M. was born with cocaine in his system; and that these facts rendered the minors' environment injurious to their welfare.

D.M. and W.M. were subsequently made wards of the court and temporarily placed in foster care. Betty was ordered to undergo inpatient drug treatment and was only permitted contact with the children through visitation supervised by the Department of Children and Family Services (DCFS). In January 1996, the children were placed with William M., their biological father and Betty's estranged husband. While the children resided with William, Betty repeatedly violated the court order prohibiting unsupervised contact with the children.

William died of heart failure on December 21, 1996, while the children were still under his care. Without notice to DCFS, D.M. and W.M. were then moved to Betty's sister's home, where Betty was living at the time, and Betty began having unsupervised contact with the children. Also, on December 20, 1996, Betty gave birth to her fourth child, L.L.

The State filed another petition for neglect against Betty on January 10, 1997. The allegations in the amended petition, which were admitted by Betty, were that: D.M., W.M., and L.L. were neglected; their environment was injurious to their welfare because their mother was found unfit on two separate occasions and there had been no

subsequent finding of fitness; and Betty's three-week-old child, L.L., tested positive for cocaine at birth. The children were adjudicated neglected and placed in shelter care and Betty's visitation was suspended.

In a supplemental petition, the State sought termination of Betty's parental rights to all three children. The amended supplemental petition for termination of parental rights, filed on February 5, 1997, alleged that Betty was unfit pursuant to section 1(D)(k) of the Adoption Act in that she was habitually addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to commencement of these proceedings and that she has given birth to three "cocaine babies." 750 ILCS 50/1(D)(k) (West 1996); 705 ILCS 405/2—13 (West 1996).

The fitness hearing was held on April 23, 1997. The court took judicial notice of three prior petitions for neglect to which Betty had admitted. Also, medical records were admitted into evidence showing that three of Betty's children, P.W., W.M., and L.L., tested positive for cocaine at birth.

Joy Juroff, the DCFS caseworker assigned to this case, testified that on March 20, 1997, she asked Betty to submit to a drug test. Because Betty voluntarily admitted that she had recently used crack cocaine, the drug test was not completed.

Betty testified that she had been addicted to crack cocaine since 1991. When asked what efforts she had made to resolve her addiction, she explained that she had completed a 60-day inpatient treatment program beginning on December 20, 1995. Upon completing the program, Betty held a job as a temporary day laborer for a month and a half. Although she did not participate in the after-care program as was required by the treatment facility, she claimed that she did not use drugs for four months after completing treatment. However, she resumed using crack cocaine on a regular basis in July 1996.

Betty testified that the only other time she voluntarily abstained from using drugs was a three-week period surrounding the birth of L.L., from mid-December 1996 to January 1997. After her social worker suggested treatment again, she entered a 90-day program in late January 1997. She acknowledged, however, that after two weeks she was either asked to leave the program or voluntarily left to clear out her deceased husband's house. She explained that she wanted to be readmitted to the treatment program after taking care of William's affairs, but was not permitted to do so. Betty testified that she continued to use drugs and that she took no steps toward getting back into treatment until a few weeks before the subject fitness hearing when she began to inquire about her treatment options. However, she admitted that she was still using crack cocaine; in fact, the last time she had used the drug was one week prior to the hearing.

In rendering his decision finding Betty unfit, the trial judge noted her long-standing addiction to drugs, the fact that she had given birth to three children with cocaine in their systems, and her continued use of crack cocaine throughout the neglect proceedings. He noted that it was not until after the commencement of these termination proceedings that she decided to attempt treatment again, yet she abandoned those efforts after just two weeks and returned to using drugs. The judge stated that he did not find believable Betty's testimony regarding periods of abstinence from drug use. He found the allegations of unfitness proved by clear and convincing evidence and set the case for a best interest hearing.

At the best interest hearing held in June 1997, Betty testified that she had recently entered a drug treatment program and had not used drugs in the past 35 days. She testified that she had made the decision to choose her children over drugs and that this time she chose to participate in the rehabilitation program for herself, unlike in 1995 when she was asked to enter a program. Her current rehabilitation program includes three to four months of inpatient treatment, of which she has completed one month, to be followed by three to four months of intensive outpatient care.

Betty stated that she believed that she would be ready to be a parent to her children sometime after January of 1998. She said that she maintains a two-bedroom apartment where she and the children would live. Betty's only relative living nearby is her sister, who has five children of her own. Betty indicated that her sister would be willing to help her with the children.

The best interest report completed by Catholic Social Services described two-year-old W.M. as a very likeable child. He experienced frequent nightmares and appeared generally tense, fearful and anxious when he was first placed in foster care; however, he has since improved. During his two visits with Betty, W.M. did not appear to know who she was and his reaction was "distant and weary." Although no family member has come forward expressing interest in adopting him, his current foster family expressed a desire to keep him in their family until an adoptive home becomes available.

The report indicated that four-year-old D.M. has significant behavior problems that have improved somewhat during his stay in foster care. He has been diagnosed as autistic and possibly suffering from cerebral palsy. He has lived with his current foster family since March 1997. His foster mother reported that D.M. has become a part of her family and she expressed interest in adopting him. The report indicated that D.M.'s foster mother would like D.M. to continue to develop a relationship with his sibling, W.M., even though they will likely be adopted into separate families.

Six-month-old L.L. was described in the report as a happy and healthy child with no current behavior problems. Because Charles L., L.L.'s putative father, has expressed interest in gaining custody of L.L., the issue of adoption by his foster family has not been pursued. The report shows that Charles L., who lives in Wisconsin, has attended every hearing and seems willing to do whatever it will take to gain custody of L.L.

The Catholic Social Services report recommended that Betty's parental rights be terminated and that D.M. and W.M. be placed under the guardianship of DCFS for adoption. It recommended that L.L. also be placed in the guardianship of DCFS until the feasibility of turning custody over to Charles L. could be ascertained. Although she considered it unfortunate that the children would be separated from one another, the guardian *ad litem* concurred with Catholic Social Services' assessment of this case. The trial court also agreed and found that it was in the best interest of all three children that Betty's parental rights be terminated. Betty appealed.

## ANALYSIS

Betty's first contention on appeal is that the State failed to prove, by clear and convincing evidence, that she was unfit due to habitual drug addiction as defined in section 1(D)(k) of the Adoption Act. 750 ILCS 50/1(D)(k) (West 1996).

■ A finding of unfitness as the basis for termination of parental rights will not be reversed on appeal unless it is contrary to the manifest weight of the evidence. *Regan v. Joseph P.*, 286 Ill. App. 3d 889, 892, 677 N.E.2d 434, 436 (1997). Reviewing courts give great deference to the findings of the trial judge in such instances since the trial judge is in the better position to observe the witnesses and evaluate the credibility of the evidence. *In re B.C.*, 247 Ill. App. 3d 803, 805, 617 N.E.2d 1207, 1209 (1993).

■ In the instant case, the allegations of unfitness were based upon section 1(D)(k) of the Adoption Act, which defines an "unfit person" as:

"any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following:

\* \* \*

(k) Habitual drunkenness or addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding." 750 ILCS 50/1(D)(k) (West 1996).

Betty contends that because she had two periods of sobriety during

the year prior to commencement of the fitness proceedings, the court could not have found her unfit under section 1(D)(k). We disagree.

We have found no cases directly interpreting the phrase "addiction to drugs other than those prescribed by a physician" as it is used in the Adoption Act. However, we may derive its meaning from cases which have interpreted the term "habitual drunkenness" used in the same context. See *In re Sanders*, 77 Ill. App. 3d 78, 82, 395 N.E.2d 1228, 1232 (1979) (finding cases interpreting the term "habitual drunkenness" as it is used in the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/401(a)(1) (West 1996)) persuasive in interpreting the use of the term in the Adoption Act).

■ In *Garrett v. Garrett*, 252 Ill. 318, 96 N.E. 882 (1911), our supreme court set forth the often-cited definition of "habitual drunkenness":

> "an irresistible habit of getting drunk; [citation] a fixed habit of drinking to excess; [citation] an involuntary tendency to become intoxicated, which is acquired by frequent repetition,—such a frequent indulgence to excess as to show a formed habit and inability to control the appetite. [Citation.]" *Garrett*, 252 Ill. at 326, 96 N.E. at 885.

An habitual drunkard has been defined as "a person given to inebriety or excessive use of intoxicating drink who has lost the power of will by frequent indulgence to control his appetite for it." *Ash v. Ash*, 327 Ill. App. 656, 659, 64 N.E.2d 741, 743 (1946). In *Lael v. Warga*, 155 Ill. App. 3d 1005, 1013, 508 N.E.2d 1095, 1101 (1987), the court explained that a finding of habitual drunkenness depends upon a determination of whether the individual had a fixed habit of drinking to excess and whether his usage was so frequent as to show an inability to control his need or craving for alcohol.

■ Based upon these principles, we interpret "addiction to drugs" under section 1(D)(k) as the inability or unwillingness to refrain from the use of drugs because frequent indulgence has instilled in the person an habitual craving which is manifested in an ongoing pattern of drug use. As with habitual drunkenness, we find that evidence of indulgence without intermission is not necessary to prove drug addiction (see *Vesolowski v. Vesolowski*, 403 Ill. 284, 287, 85 N.E.2d 695, 697 (1949); *Grikietis v. Grikietis*, 319 Ill. App. 216, 217, 48 N.E.2d 775, 776 (1943)), and the fact that one may voluntarily abstain for short periods of time will not preclude a finding of drug addiction (see *Holmstedt v. Holmstedt*, 383 Ill. 290, 297, 49 N.E.2d 25, 29 (1943)). It is sufficient to show that a person has demonstrated an inability to successfully gain control over his or her habitual craving to use the drug.

■ In the instant case Betty admitted that she had been addicted

to crack cocaine since 1991. At the time of the fitness hearing, she had attempted rehabilitation through treatment on two occasions, neither of which was ultimately successful. Despite the fact that she claimed to have a desire to change her ways, she admitted that she continued to use crack cocaine throughout the pendency of these proceedings and last used the drug one week prior to the fitness hearing. Further evidence of the gravity of her addiction is found in the fact that she was unable to refrain from drug use during three of her pregnancies, which resulted in the birth of three children testing positive for cocaine.

Even accepting Betty's testimony that she had two periods of abstinence from drug use during the previous year, which the trial court expressly found unbelievable, it would not negate the overwhelming evidence that she has been dominated by her addiction for the past six years. Therefore, because we find no support for Betty's contention that the trial court's finding of unfitness was against the manifest weight of the evidence, we affirm.

■ Betty also argues that the trial court erred in finding that termination of her parental rights was in the best interest of her children. Betty contends that the interests of her children would have been best served by returning them to her. Again, we disagree.

Although parental rights and responsibilities are of deep human importance and will not be lightly terminated, the deference accorded to parental rights does not negate a court's responsibility to protect minors from neglect and abuse. In re E.M., 295 Ill. App. 3d 220, 227, 692 N.E.2d 431, 436 (1998). Therefore, once parental unfitness has been found, all of the parent's rights must yield to the best interests of the child. In re T.G., 147 Ill. App. 3d 484, 488, 498 N.E.2d 370, 373 (1986). A trial court's determination that it is in a child's best interest to terminate the rights of his or her parent is given great deference and will not be reversed on appeal unless it is contrary to the manifest weight of the evidence. In re V.O., 284 Ill. App. 3d 686, 690, 673 N.E.2d 439, 442 (1996).

In the instant case, Betty has failed to point to any evidence justifying reversal of the trial court's decision. She suggests that her current 35 days of sobriety demonstrate both a sincere desire to stop using drugs and an expression of her recommitment to her children. Her reentry into a drug treatment program is commendable, and we hope that Betty will someday have the personal strength to overcome her drug addiction. However, in this record there is no evidence to suggest that the termination of her parental rights and the appointment of a guardian with the authority to consent to the adoption of these children was not, in fact, in their best interest. See In re K.S.,

203 Ill. App. 3d 586, 596, 560 N.E.2d 1380, 1386 (1990). Betty's current attempt at rehabilitation is immensely overshadowed by the rest of the evidence presented in this case of her long-standing drug dependency.

Meanwhile, all three of the children are developing well and located in secure and loving, although separate, foster homes. L.L.'s putative father, who lives in Wisconsin, is interested in obtaining custody of him. D.M., who has special needs, has grown to be a part of his foster family's home so much so that his foster parent is interested in adopting him. W.M. is content in his foster home and his foster parent is willing to keep him as a part of her family until an adoptive home becomes available.

Based upon all of the evidence in the record, we cannot say that the trial court's decision to terminate Betty's parental rights was against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed.

Judgment affirmed.

LYTTON and SLATER, JJ., concur.