713 N.E.2d 784 (1999)
305 Ill. App.3d 869
239 Ill.Dec. 253
In the Interest of H.C. and H.C., Minors, (The People of the State of Illinois, Petitioner-Appellee, v. Lisa Head, Respondent-Appellant).
No. 4-98-0458.
Appellate Court of Illinois, Fourth District.
June 30, 1999.
*785 Carol A. Dison (Court-appointed), Beckett & Webber, P.C., Urbana, for Lisa Head.
John C. Piland, Champaign County State's Attorney, Urbana, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, James C. Majors, Staff Atty., State's Attorneys Appellate Prosecutor, Springfield, for the People.
Sherman J. Brown, Guardian Ad Litem (Court-appointed), Champaign, for H.C.
Justice COOK delivered the opinion of the court:
In January 1998, the circuit court of Champaign County adjudicated Lisa Head to be an unfit parent. In April 1998, the court terminated her parental rights to her two-year-old son, H.C., and her one-year-old daughter, Ha.C. Lisa appeals.
In January 1996, Lisa left her trailer home to do laundry, leaving three-month-old H.C. at home with his father, Terry C. When she returned, H.C. had multiple bruises on his face. Terry C. explained H.C. fell out of his grasp, hitting his face on a table and then the floor. Terry C. admitted he might have pushed the child a little. Lisa brought H.C. to the hospital, where he was examined by Dr. Basillio. H.C. had several bruises on both sides of his face, but nowhere else. Basillio stated the injuries might be consistent with falling and hitting his face on a table and floor.
The Illinois Department of Children and Family Services (DCFS) sought a second opinion from pediatrician Dr. Buetow. She determined the injuries were not consistent with the parents' statements as to how they occurred. Buetow believed H.C. had been struck intentionally by an object, possibly a belt with a buckle.
Based on the injuries and the inconsistent statements by his parents, H.C. was taken into protective custody. The State filed a petition, alleging H.C. was neglected and abused by being in an environment that was injurious to his welfare. DCFS filed a home and background report with the court in March 1996. According to the report, Lisa dropped out of high school in the tenth grade and became pregnant when she was 17. She later married Gary Head and had another child with him. After several years, she and Head divorced and the custody of her two children was awarded to Gary. Lisa continued to visit the children.
Lisa started dating Terry C. in September 1994 and moved in with him in November 1994. Lisa and Terry C. had an intertwined family relationship. Lisa's twin sister was married to Terry C.'s brother, and Lisa's *786 father was married to Terry C.'s mother. H.C. was born to Lisa and Terry C. in September 1995. At first, Lisa was in shock and disbelief at the allegation that Terry C. had abused their son.
Terry C. had a history of criminality. Terry C. had been arrested several times and had spent four different terms in prison for theft, burglary, forgery, and aggravated battery. The aggravated battery conviction stemmed from a physical altercation where he injured a girlfriend. Terry C. drank alcohol regularly and admitted using various drugs in the past.
In March 1996, the court adjudicated H.C. an abused minor. At a dispositional hearing in April 1996, the court found that Terry C. had inflicted the physical abuse. The court also found that Lisa was unfit to care for H.C. because:
"[s]he refuses to believe or even consider that the respondent father physically abused the respondent minor. She is clearly more concerned with her relationship with the respondent father than the safety of the respondent minor."
H.C. was placed in foster care and Lisa was ordered to establish and maintain a regular course of visitation with H.C. and to fully cooperate with DCFS with respect to any recommended counseling or parenting classes.
A review report, dated September 16, 1996, stated that Lisa and Terry C. still lived together and both had supervised visitations with H.C. twice a week. H.C. always appeared happy to see Lisa and Terry C., especially Terry C. Lisa only missed a few visitations, and those were because of car trouble and sickness. Lisa completed a psychological evaluation, a substance-abuse assessment, and was engaged in parenting education and counseling. Lisa's attendance at counseling sessions was sporadic and Terry C. did not attend any counseling. The report concluded that both Lisa and Terry C. had made "very little progress towards attendance and completion of services." Terry C. still denied he abused H.C.
Terry C. moved out of Lisa's trailer in early October 1996. Lisa claimed Terry C. no longer lived with her because of the injuries to H.C. and so that she would not lose custody of her next child, Ha.C. Lisa gave birth to Ha.C. shortly after Terry C. moved out. Terry C. was also the father of Ha.C. A supplemental petition was filed, alleging Ha.C. was neglected and abused. The court found probable cause to believe the petition and ordered DCFS to be Ha.C.'s temporary guardian.
In January 1997, a review report stated that Lisa acknowledged that Terry C. was responsible for H.C.'s injuries, but she was not sure whether they were accidental or intentional. She stated she would not let Terry C. have unsupervised contact with the children if they were returned to her. Terry C. still denied he abused H.C. and did not attend counseling.
Meanwhile, H.C. and Ha.C. were adjusting well in the foster home of Loren and Cheryl Engstrom. The Engstroms already had six biological children living at home. A DCFS report stated Cheryl seemed to derive a great deal of pleasure in her role as protector of H.C. and Ha.C., and the Engstroms took a very active role in the children's case. From the beginning, the Engstroms seemed against the idea of the children returning home to their parents. Cheryl told a DCFS worker before H.C. and Ha.C. were placed with her that she "did not like working with natural parents." Also, she could not understand why DCFS decided to use her home if they intended to reunite Lisa with her children. Cheryl was also angry that DCFS was not seeking or using her input about Lisa's parenting capacity.
In December 1996, the Engstroms wrote a letter to the judge, stating a DCFS caseworker told them that DCFS planned to return the children to Lisa in February 1997. The Engstroms were concerned that DCFS was "rushing to accomplish this goal" and that the children's best interests would not be met. Pursuant to the Engstroms' request, the judge appointed Barbara Powell as court-appointed special advocate (CASA) to H.C. and Ha.C.
A DCFS review report, dated April 23, 1997, stated Lisa had made "tremendous progress" since the last report. She had *787 completed parenting classes, maintained housing and employment, and attended all of her counseling sessions and visitations. Lisa's visits were very interactive with her children. Terry C. also resumed visitation with the children, and appeared to be "very bonded" with H.C. and Ha.C. However, Terry C. still refused to participate in counseling.
In May 1997, the State filed a petition seeking termination of Terry C.'s parental rights. Terry C.'s parental rights were terminated in September 1997.
In August 1997, a DCFS review report stated Lisa was pregnant again and due to deliver in late December 1997. Lisa claimed Terry C. was not the father. (The father was later stated to be Chris Anderson.) The Engstroms expressed their desire to take Lisa's unborn child into their family should the court decide to remove the child at birth.
Another DCFS review report, dated October 9, 1997, showed that Lisa had continued her progress, completing all of the recommended counseling and maintaining visitation with her children. Lisa claimed she understood that Terry C. could not be around H.C. and Ha.C. and that she would not jeopardize getting her children back by being associated with him. The report stated "[i]t is clearly evident that [Lisa] loves her children and wants them home." The report recommended Lisa be granted unsupervised extended overnight and weekend visitation.
On October 15, 1997, CASA Powell wrote to the judge that H.C. and Ha.C. had become attached to the Engstroms. Powell also believed Lisa's new pregnancy would impact her ability to care for H.C. and Ha.C. Finally, Powell was concerned about evidence that suggested Lisa was still seeing Terry C.
On October 21, 1997, the State filed a petition seeking termination of Lisa's parental rights, alleging she had failed to make reasonable progress toward the return of her children and had failed to make reasonable efforts to correct the conditions that were the basis of the removal of the children.
An adjudicatory hearing was held in January 1998. The court took judicial notice of Lisa's file and previous proceedings "to the extent that they meet the evidentiary requirements of this hearing." Various caseworkers testified as to Lisa's progress, including Jennifer Bogner, Norman Lambert, Marilyn Walker, and Gladys Hunt. Essentially, the caseworkers testified Lisa had successfully completed the DCFS programs and had acknowledged, after some initial reluctance, that Terry C. was responsible for H.C.'s abuse. Lisa informed the caseworkers she no longer had a sexual relationship with Terry C. and would not let him around her children.
The State also presented evidence of Lisa's contacts with Terry C. Walker testified that in October 1997, Lisa visited Terry C. twice while he was in the county jail. Lisa claimed she only went there to inform Terry C. that his mother (Lisa's stepmother) had been hospitalized from a stroke and that his nephew was having his kidney removed. In April 1997, Lisa was at her sister's house and Terry C. showed up. Lisa started having back pains, so Terry C. drove her to the hospital. In August 1997, Cheryl spotted Lisa and Terry C. together at Meijer department store, where Lisa worked. Cheryl took a picture of them together in the parking lot. At first, Lisa lied to her caseworker about seeing Terry C. at Meijer, but later admitted seeing him there more than once. Cheryl also spotted Lisa and Terry C. together at a local gas station and informed DCFS. Lisa claimed her car broke down and Terry C. came to help fix it. Lisa claimed Cheryl was stalking her and she did not feel safe.
Lisa testified she had not had a sexual relationship with Terry C. in 1997, and he was not the father of her newborn child. Lisa stated she would not pursue a relationship with Terry C. in the future. She stated he posed a risk to her children and she did not want him to have unsupervised contact with them. Lisa admitted lying about seeing Terry C. at the department store because she was afraid it might hurt her chances of getting her children back. She testified she had not contacted him in prison, where he was currently serving a two-year sentence.
The trial court found in favor of the State, holding Lisa was unfit because she failed to make reasonable progress within 12 months *788 of the adjudication of neglect and because she failed to make reasonable efforts to correct the conditions which were the basis for the removal of her children. The court stated it did not matter that Lisa completed the checklist of DCFS services because she still maintained contact with Terry C. Lisa's parental rights to H.C. and Ha.C. were terminated on April 7, 1998.
Lisa gave birth to D.P. in December 1997. The State subsequently filed a petition alleging D.P. was neglected and abused based on Lisa's contacts with Terry C. That case has proceeded under another judge and is separate from this appeal.
Lisa appeals, arguing the court erred in finding her unfit. An appellate court will not set aside a trial court's finding of unfitness unless it is contrary to the manifest weight of the evidence. In re T.B., 215 Ill.App.3d 1059, 1062, 158 Ill.Dec. 780, 574 N.E.2d 893, 896 (1991). A parent is deemed unfit if the State can show by clear and convincing evidence that the parent failed to make "reasonable progress" toward the return of his or her child. 750 ILCS 50/1D(m) (West 1996); In re M.W., 199 Ill.App.3d 1050, 1053, 146 Ill.Dec. 17, 557 N.E.2d 959, 961 (1990). The standard for "reasonable progress" is an objective one. In re A.P., 277 Ill.App.3d 593, 598, 214 Ill.Dec. 299, 660 N.E.2d 1006, 1011 (1996). "Reasonable progress" exists when a parent shows a minimum measurable or demonstrable movement toward the return of his or her child. A.P., 277 Ill.App.3d at 598, 214 Ill.Dec. 299, 660 N.E.2d at 1011. A court should not make a finding of reasonable progress unless the evidence shows the parent's conduct is improving and will soon comply with ordered directives. In re L.L.S., 218 Ill.App.3d 444, 461, 160 Ill.Dec. 804, 577 N.E.2d 1375, 1387 (1991).
After Lisa's children were removed, she was instructed to maintain visitation with them and to attend any recommended parenting classes and counseling sessions. The court did not order Lisa to stay away from Terry C., although she was told by a caseworker that contact with Terry C. would jeopardize her chances of getting her children returned.
Based solely on the evidence and testimony produced at Lisa's fitness hearing, we conclude the trial court's finding of parental unfitness was contrary to the manifest weight of the evidence. Certainly, Lisa made reasonable progress with respect to DCFS-recommended services. Various caseworkers testified Lisa successfully completed DCFS programs. Lisa was cooperative with her visitation schedule, always attending and calling to confirm 24 hours in advance. The children bonded with Lisa and were comfortable while visiting in Lisa's home.
Lisa's completion of services is commendable. However, Lisa's children were not removed because of poor parenting skills or lack of interest in her children. Lisa's children were removed because she exposed them to danger by leaving H.C. in Terry C.'s care and refusing to "even consider" that Terry C. had abused the child. Therefore, to make reasonable efforts to correct this condition, Lisa needed to acknowledge that Terry C. may have abused H.C. and to take steps to ensure it would not happen again.
Lisa testified at the fitness hearing she knew Terry C. presented a risk to her children and she did not want him to have unsupervised visitation with the children. She stated she would not let Terry C. have unsupervised contact with the children if they were returned to her. By acknowledging the possibility that Terry C. abused H.C., Lisa took the first step toward correcting her situation. We recognize Lisa could have more forcefully stated that Terry C. did, in fact, abuse H.C. However, we find Lisa's stance was not unreasonable considering she was not present when H.C. was injured, no evidence showed Terry C. had ever been violent with a child before or since the incident, and the first doctor to examine H.C. stated the injuries may have been consistent with Terry C.'s explanation. We conclude that Lisa's stating Terry C. was a risk and should not have unsupervised visitation with the children showed some progress.
Having accepted that Terry C. was a risk, Lisa also needed to make reasonable efforts to alleviate that risk. Since Terry C. never admitted he abused H.C., that risk could *789 never be alleviated so long as Terry C. lived with Lisa or maintained an intimate relationship with her.
Terry C. moved out of Lisa's trailer in October 1996. No evidence suggests Terry C. moved back in with Lisa or spent the night with her since he moved out. Lisa testified she had not been sexually intimate with Terry C. in all of 1997, and that she would not pursue a relationship with him in the future. Based on Lisa's diligent cooperation with DCFS, her acknowledgement that Terry C. was a risk to her children, and the uncontradicted evidence that Lisa is no longer living with or dating Terry C., Lisa made reasonable efforts to correct the condition that was the basis of the removal of the children.
However, the trial court came to the opposite conclusion based on five separate contacts Lisa had with Terry C. during 1997, and her lies about one of the contacts. The court perceived that Lisa was insincere about her relationship to Terry C. and could not be trusted to keep her children safe from Terry C. or other alcoholic abusers. The court found she was unable to set boundaries with respect to Terry C. and was too accommodating to everyone around her.
We conclude the trial court's determination was manifestly erroneous. We fail to see how Lisa's brief and public contacts with Terry C. somehow nullifies the proved and demonstrable efforts she has made to cooperate with DCFS, bond with her children, and remove Terry C. from her home. Admittedly, Lisa's efforts would be meaningless if evidence clearly showed she was still romantically involved with Terry C. and her "progress" was fraudulent. However, the evidence falls far short of proving that. The State did not produce any witness or evidence indicating Lisa still lived with Terry C. or was intimately involved with him. The evidence of Lisa's encounters with Terry C. proves only that she was seen with Terry C. in public on a handful of occasions over a one-year period. Other people were present during these incidents, but the children were not. A finding that Lisa was present with Terry C. in public does not amount to a finding that she would bring the children around Terry C. It certainly does not mean she would ever leave her children alone with him. The equivocal evidence of contacts does not outweigh the tangible efforts Lisa has demonstrated, nor does it amount to the clear and convincing evidence needed to overcome the presumption of parental fitness.
Our decision to reverse the trial court's determination of parental unfitness is not made lightly. We recognize the trial court's findings should be given great deference since its opportunity to evaluate the parties and their testimony is superior to the reviewing court's opportunity. In re Pronger, 118 Ill.2d 512, 526, 115 Ill.Dec. 390, 517 N.E.2d 1076, 1081 (1987). However, we also recognize that parental rights and responsibilities are of deep human importance and should not be lightly terminated. In re Paul, 101 Ill.2d 345, 351-52, 78 Ill.Dec. 149, 461 N.E.2d 983, 985 (1984). In the present case, no evidence showed Lisa has ever abused or neglected her children. The record clearly shows she loves her children and they are bonded to her. After her children were removed, she attended all DCFS classes and visitations and was able to articulate her need to be assertive and the importance of protecting her children from abuse. She acknowledged that Terry C. presented a risk to her children and no longer lives with Terry C. We are also mindful that H.C. and Ha.C. have spent a great deal of their lives with the Engstroms, and the Engstroms are in a better financial position to care for the children. Although it is tempting to affirm the trial court's decision based on this factor, we are duty bound to ignore it. When the State seeks to terminate the parental rights of a parent, the court must determine the parent's unfitness before it may proceed to a consideration of the child's best interests. In re Adoption of Syck, 138 Ill.2d 255, 276, 149 Ill.Dec. 710, 562 N.E.2d 174, 183 (1990). The Engstroms may be wonderful parents, but H.C. and Ha.C. are Lisa's children. Before her parental rights may be terminated, the law affords her the opportunity to make reasonable efforts to correct the conditions that caused the removal of the children. We conclude *790 the only fair and reasonable view of the record shows she made those efforts.
Finally, the behavior of the foster parents, the Engstroms, deserves comment. On one hand, the Engstroms should be applauded for their efforts in providing a stable and nurturing home for H.C. and Ha.C. On the other hand, we are concerned that their zeal in protecting the children may have unduly interfered with the reunification of the family and the ultimate best interests of the children. The primary goal of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1996)) is to strengthen family ties whenever possible and to reunify the original family. Johnson v. Burnett, 182 Ill.App.3d 574, 582, 131 Ill.Dec. 517, 538 N.E.2d 892, 897 (1989). However, Cheryl made it clear from the beginning she did not want the children reunited with Lisa, but wanted the children permanently placed with her family. If not for Cheryl's behind-the-scenes efforts and constant opposition to Lisa's case, the children might already be with their natural mother. Whether that is where the children properly belong remains to be seen. Regardless, DCFS and foster families should keep in mind that "[t]he role of the foster parent, as envisioned by Illinois law, is that of a temporary way station on the road of a child's life until the difficulties at home can be straightened out." Johnson, 182 Ill. App.3d at 582, 131 Ill.Dec. 517, 538 N.E.2d at 897.
The State fell far short of proving Lisa unfit by clear and convincing evidence; therefore, we reverse the judgment of the trial court terminating her parental rights.
It is difficult to determine what evidence was considered by the trial court in these cases, where the trial court takes judicial notice of unspecified materials, and the briefs filed by the parties discuss all the evidence presented at the hearings. The dissent complains that "the majority reverses Judge Einhorn based on evidence she never even heard." 239 Ill.Dec. at 263, 713 N.E.2d at 794. That is incorrect. Our reversal is based solely on the evidence and testimony produced at the fitness hearing. We do attempt to put the facts of this case into context, for example by discussing the January 1996 incident that precipitated these proceedings. It is difficult to believe that the trial court was unaware of those facts. Although we refer to prior hearings and the orders entered in those proceedings, everything of any importance at those hearings was presented to the court at the fitness hearing in one way or another. The dissent does not suggest that our decision is wrong on the merits. The dissent complains only of our method in this case and does not identify any important evidence that was not properly before Judge Einhorn at the fitness hearing. Indeed, if some important evidence was not presented at the fitness hearing, we should ask why it was not presented. Finally, the strict rules of evidence at fitness hearings are designed to protect those whose parental rights are being terminated, not to protect trial courts from reversal.
Reversed.
McCULLOUGH, J., concurs.
STEIGMANN, J., dissents.
Justice STEIGMANN, dissenting:
Perhaps the most fundamental rule of appellate review is that an appellate court reviews trial court judgments based only upon the evidence presented at the trial level. See People v. Reimolds, 92 Ill.2d 101, 106-07, 65 Ill.Dec. 17, 440 N.E.2d 872, 875 (1982). Thus, in determining whether a trial court judgment was correct, this court should not consider evidence the trial court never heard. Because the majority opinion violates this fundamental rule, I respectfully dissent.

I. THE MAJORITY'S CONSIDERATION OF EVIDENCE NEVER PRESENTED AT THE FITNESS HEARING
In January 1998, Judge Ann Einhorn adjudicated Lisa to be an unfit parent. In April 1998, Judge Einhorn terminated Lisa's parental rights to her two children, and Lisa appeals that termination. The correctness of the trial court judgment terminating Lisa's parental rights, which arose out of the January 1998 fitness hearing, is the only issue before us on appeal. Accordingly, when reviewing that judgment, this court must limit *791 itself to the evidence presented at that fitness hearing. Regrettablyand inexplicablythe majority has refused to do so.
As shown by the attached appendix, the majority opinion is riddled with references to "evidence" Judge Einhorn never heard at the January 1998 fitness hearing. This other information is taken from earlier stages in the juvenile court proceedings involving Lisa and her children, such as DCFS reports and evidence presented at review hearings after the children were removed from Lisa's custody. The majority's consideration of such "evidence" constitutes particularly egregious error that can only confuse practitioners and litigants, even if the majority merely refers to it as "background."
First, the strict rules of evidence apply at all fitness hearings, including the one we are supposed to be reviewing. See In re M.S., 239 Ill.App.3d 938, 946, 179 Ill.Dec. 936, 606 N.E.2d 768, 773 (1992). In contrast, no rules of evidence limit the admissibility of information presented at review hearings. Section 2-28 of the Juvenile Court Act of 1987(Act) (705 ILCS 405/2-28 (West Supp.1997)) provides that at review hearings, "[a]ll evidence relevant to determining [questions regarding a child's placement], including oral and written reports, may be admitted and may be relied on to the extent of their probative value." Thus, by considering review reports and other information presented in earlier stages of these proceedings, the majority not only fails to limit itself to the evidence actually presented at the fitness hearing, but the majority does not even limit itself to the evidence that could have been admitted at that hearing.
Second, Judge John DeLaMar conducted almost all of the earlier juvenile court proceedings from which the majority obtains the information it considers on appellate review. However, Judge Einhorn, not Judge DeLaMar, presided at the January 1998 fitness hearing. Thus, even though it would have been error for Judge Einhorn to have considered information presented at the earlier review hearings, at least she would have heard it; in this case, the majority reverses Judge Einhorn based on evidence she never even heard.

II. THE PROPER SCOPE OF JUDICIAL NOTICE IN TERMINATION CASES
The majority opinion contains the following statement: "An adjudicatory hearing was held in January 1998. The court took judicial notice of Lisa's file and previous proceedings `to the extent that they meet the evidentiary requirements of this hearing.'" (239 Ill.Dec. at 259, 713 N.E.2d at 790.) Surely the majority's reference to judicial notice cannot be the basis upon which it contends that all of the otherwise inadmissible information Judge DeLaMar heard regarding Lisa and her children prior to the fitness hearing could somehow be (1) viewed as evidence properly before Judge Einhorn at the fitness hearing, (2) relied upon by Judge Einhorn in her ruling, or (3) appropriately considered by this court when we review Judge Einhorn's ruling.
Indeed, our recent decision in In re J.G., 298 Ill.App.3d 617, 629, 232 Ill.Dec. 720, 699 N.E.2d 167, 175 (1998), should have put to rest the issue of "judicial notice of prior proceedings" as a basis for a claim that the trial courtor this courtcould consider otherwise inadmissible material when resolving (or reviewing) the issue of parental fitness. In that case, this court wrote that although the trial court must necessarily take notice of certain facts relating to how a juvenile case has reached the point at which a fitness hearing is being held, "wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate." J.G., 298 Ill.App.3d at 629, 232 Ill.Dec. 720, 699 N.E.2d at 175. Significantly, in J.G., we concluded as follows: "Above all, the trial court's decision as to whether a parent is unfit should be based only upon evidence properly admitted at the unfitness hearing." J.G., 298 Ill.App.3d at 629, 232 Ill.Dec. 720, 699 N.E.2d at 175-76. See also In re C.M., 305 Ill.App.3d 154, 165, 238 Ill.Dec. 422, 711 N.E.2d 809 (1999), where this court cited J.G. and wrote the following:
"We have previously held that a court's findings in an adjudicatory hearing on a petition to terminate parental rights must *792 be based only upon the evidence presented during that hearing. [Citation.] By relying instead on evidence presented at a different hearing, nearly five years in the past, the court erred."

III. THE PROPER SCOPE OF REVIEW IN TERMINATION CASES
In this appeal, this court's focus must be solely on the evidence the trial court heard at the fitness hearing because we are reviewing only the judgment arising from that hearing. If the State did not present sufficient evidence to meet its burden at that hearing, we should reverse. However, we ought not reverse a trial court based upon "evidence" it never heard. As this court has previously written:
"[T]his is a court of review, meaning we are supposed to be reviewing the evidence presented to the trial court and its rulings and findings thereon. No citation is necessary for the proposition[] of law that * * * a party who has failed to present evidence at the trial level * * * may not overcome that deficiency by presenting that evidence to the court hearing the case on appeal." (Emphasis in original.) L.L.S., 218 Ill. App.3d at 465, 160 Ill.Dec. 804, 577 N.E.2d at 1389.
Consistent with its concerns that the rules of evidence be appropriately applied in juvenile court proceedings, the General Assembly has recently amended section 2-18 of the Act, entitled "Evidence," by adding the following:
"In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right to counsel was knowingly waived and (b) the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited." (Emphasis added.) 705 ILCS 405/2-18(6) (West 1998) (as amended by Pub. Act 90-608, § 30, eff. June 30, 1997 (1998 Ill. Legis. Serv. 1575, 1604)).
This change predates the sound decision of this court in J.G. concerning limits upon a court's taking judicial notice in juvenile court proceedingsthe decision that the majority in this case disregards.
The following two scenarios demonstrate the inappropriateness of the majority's approach in this case:
(1) Defendant Jones is convicted of a felony offense in a bench trial before Judge Brown. On appeal, Jones argues that the evidence was insufficient to sustain his conviction, and in support of that argument, he cites allegedly exculpatory evidence that Judge Brown heard when he conducted Jones' preliminary hearing. However, for whatever reason, that evidence was not presented at trial.
(2) In a civil bench trial, Judge Brown finds in favor of the defendant and rejects plaintiff Smith's argument that Smith's injuries were due to the defendant's negligence. On appeal, Smith argues that Judge Brown's decision was contrary to the manifest weight of the evidence and a new trial is required. In support of that argument, Smith cites the factual averments contained in affidavits and depositions presented toand considered by Judge Brown when he ruled on and denied the parties' respective motions for summary judgment prior to trial. However, for whatever reason, the cited affidavit and deposition evidence was not presented at the bench trial.
Surely each of my colleagues in the majority would reject both of the above arguments and follow the fundamental rule that in reviewing the trial court's judgment, this court must restrict itself to considering only the evidence actually before the court at trial, not any pretrial material never presented at trial. Yet, no principled basis exists to distinguish the above two scenarios from the present case, in which the majority reverses the trial court's decision to terminate parental rights based upon evidence never presented at the fitness hearing.

IV. PREPARING THE RECORD AND BRIEFS IN TERMINATION CASES
Counsel can assist the reviewing courts in termination cases by focusing their attention, *793 and thereby ours, on those parts of the recordand only those parts of the record which are salient to the judgment for which review is sought.
Counsel should avoid beginning the statement of facts with the first involvement of DCFS, which led in turn to the shelter-care hearing, the petition for adjudication, the hearing thereon, the dispositional hearing, and each and every review hearing, culminating with the filing of the petition for termination and the adjudicatory and best interests hearings thereon.
Instead, counsel should proceed as follows:
(1) begin with an overview of the trial court orders predating the petition to termination parental rights (see, e.g., C.M., 305 Ill.App.3d at 156-158, 238 Ill.Dec. 422, 711 N.E.2d 809, (describing the trial court procedures leading up to the petition to terminate parental rights));
(2) lay out the allegations of the petition to termination (see, e.g., In re D.M., 298 Ill. App.3d 574, 577, 232 Ill.Dec. 765, 699 N.E.2d 212, 214 (1998));
(3) summarize the evidence presented at the adjudicatory hearing on the termination petition, including the specific items of evidence that the State asked the court to take judicial notice of and the court's rulings thereon (see, e.g., In re R.G., 165 Ill.App.3d 112, 115-26, 116 Ill.Dec. 69, 518 N.E.2d 691, 693-700 (1988)); and
(4) summarize the evidence presented at the best interest hearing, if pertinent (see, e.g., D.M., 298 Ill.App.3d at 578-79, 232 Ill. Dec. 765, 699 N.E.2d at 215-16).
In preparing the record on appeal, counsel should include the transcripts of the hearings referred to in (3) and (4) and those specific items of which the trial court took judicial notice. In short, counsel should focus on the evidence presented at the hearing on the particular judgment on appeal.

V. CONCLUSION
Cases involving the termination of parental rights are difficult and emotional, made no less so by their ever-increasing number in the Illinois judicial system. Given the stakes involved, all parties deserve the best that this system can deliver. Regrettably, the majority opinion falls far short of that mark. That opinion, if left to stand, will serve only to confuse the bench and bar in this important area. I can only hope that the supreme court will review this decision, reverse it, and reinstate the fundamental rule of appellate review that the appellate court must limit itself, when reviewing trial court judgments, to considering only the evidence before the trial court when the judgment was entered.

APPENDIX

(Bold letters indicate which judge presided at the relevant stage of the proceedings)
1. The majority describes in detail a January 1996 incident that led to the placement of H.C. into shelter care, including a discussion of two different doctors' examinations of H.C. and their conclusions. 239 Ill.Dec. at 257-258, 713 N.E.2d at 788-789. However, the trial court heard no evidence about this incident at the fitness hearing. The court's shelter-care order states only that "a physician" concluded that the bruises were inconsistent with a fall. (Judge DeLaMar presided at the shelter-care hearing.)
2. The majority discusses respondent's family history and how she met Terry C. 239 Ill.Dec. at 257-258, 713 N.E.2d at 788-789. Although testimony at the fitness hearing established the "intertwined family relationship" between respondent and Terry C. that the majority describes, no party at the fitness hearing presented evidence on how and when the two met. (Judge DeLaMar received the home and background report upon which the majority relies and presided at the April 1996 dispositional hearing.)
3. The majority quotes a September 1996 review report as saying that respondent and Terry C. had made "`very little progress towards attendance and completion of services.'" 239 Ill.Dec. at 258, 713 N.E.2d at 789. That report, however, was not admitted into evidence at the fitness hearing and is likely inadmissible hearsay. (Judge DeLaMar *794 presided at the September 1996 review hearing.)
4. The majority states that in January 1997, "[Terry C.] still denied he abused H.C. and did not attend counseling." 239 Ill.Dec. at 258, 713 N.E.2d at 789. No evidence at the fitness hearing supports this statement. (Judge DeLaMar presided at the January 1997 dispositional hearing.)
5. The majority includes an extensive discussion of how H.C. and Ha.C. adjusted to their foster home, what sort of household the foster parents provided for the children, and what sort of attitude the foster parents exhibited toward the original goal of returning the children to respondent. This discussion includes a quotation from a letter that the foster mother wrote to the trial judge. 239 Ill.Dec. at 258-259, 713 N.E.2d at 789-790. However, at the fitness hearing, the trial court heard no evidence on this topic. In addition, the letter quoted by the majority, which was not admitted into evidence at the fitness hearing, was addressed to a different trial judge than the one who presided over the fitness hearing. (Judge DeLaMar presided at the March 1997 review hearing.)
6. The majority quotes an April 1997 review report as saying that respondent had made "`tremendous progress'" and that Terry C. was "`very bonded'" with the children. 239 Ill.Dec. at 258-259, 713 N.E.2d at 789-790. That review report was not entered into evidence at the fitness hearing, and although caseworkers testified regarding respondent's progress, the court heard no evidence regarding Terry C.'s visits. (Judge DeLaMar presided at the May 1997 review hearing.)
7. The majority discusses the contents of August 1997 and October 1997 review reports. 239 Ill.Dec. at 258-259, 713 N.E.2d at 789-790. Although the information that the majority derives from those reports ended up in evidence at the fitness hearing, the reports themselves were not admitted into evidence. Despite that fact, the majority quotes from and refers directly to the conclusions of the October 1997 review report. 239 Ill.Dec. at 259, 713 N.E.2d at 790. (Judge Einhorn presided at the October 1997 review hearing.)
8. The majority discusses a letter written from CASA Powell to the trial court in October 1997. 239 Ill.Dec. at 259, 713 N.E.2d at 790. However, that letter was not admitted into evidence at the fitness hearing. (Powell's letter was addressed to Judge Einhorn.)
9. The majority describes an incident involving respondent and Terry C. when the foster mother purportedly saw them together at Meijer. 239 Ill.Dec. at 259, 713 N.E.2d at 790. The foster mother herself did not testify at the fitness hearing, so it is unclear how the majority knows what she saw. (Judge Einhorn presided at the October 1997 review hearing.)