*In re* D.W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. L.M., Respondent-Appellant).

First District (2nd Division)   No. 1—02—1606

Opinion filed September 30, 2003.

32

Rita A. Fry and Edwin A. Burnette, Public Defenders, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Allison I. Ortlieb, of counsel), guardian *ad litem*.

JUSTICE BURKE delivered the opinion of the court:

Respondent L.M. appeals from an order of the circuit court terminating her parental rights with respect to her minor son, D.W., pursuant to section 2—29(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—29(2) (West 1998)) and section 1(D)(q) of the Illinois Adoption Act, as amended in 1998 (750 ILCS 50/ 1(D)(q) (West 1998)). On appeal, respondent argues that: (1) section 1(D)(q) of the Illinois Adoption Act violates the due process and equal protection clauses of the United States and Illinois Constitutions; and (2) the trial court abused its discretion in finding that it was in D.W.'s best interests to terminate respondent's parental rights. For the reasons set forth below, we affirm.

In 1990, respondent was convicted of the attempted murder of her infant son, D.E. The indictment alleged that respondent poisoned D.E. with Pine Sol by feeding it to him in his bottle. Respondent was sentenced to six years' imprisonment. At that time, respondent had three children, M.E., Q.E., and D.E. The children were placed in their father's custody when respondent went to prison.

Following her early release from prison, on March 7, 1994, respondent gave birth to D.W. In 1995, the State filed a petition for adjudication of wardship of D.W. based on respondent's prior conviction and her history of reports with the Department of Children and Family Services (DCFS) from 1987 to 1990, including reports of neglect, inadequate supervision, and the alleged poisoning of another one of her children. Following a temporary custody hearing, the State removed D.W. from respondent's home, pending an adjudicatory hearing. The adjudicatory hearing began in October 1995, but was continued until February 1996. At the adjudicatory hearing in 1996, the juvenile court found that D.W. was at substantial risk of physical injury and permanently removed D.W. from respondent's custody. On appeal, this court reversed the juvenile court's decision after finding that the juvenile court violated the time limitation for an adjudicatory hearing provided in section 2—14(b) of the Juvenile Court Act (705

ILCS 405/2—14(b) (West 1994)). *In re D.W.*, No. 1—96—1996 (1998) (unpublished order under Supreme Court Rule 23).

The State then filed another petition for adjudication of wardship of D.W. on April 3, 1998. The State alleged in the petition that D.W. was abused and faced substantial risk of physical injury under section 2—3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2—3(2)(ii) (West 1996)). The petition included respondent's prior conviction and her previous contacts with DCFS. On August 28, the juvenile court found that D.W. was abused or neglected under section 2—3(2)(ii) based on respondent's: (1) criminal conviction for the attempted murder of her child, D.E.; (2) five prior DCFS reports of abuse and neglect; and (3) failure to undergo recommended mental health treatment. At that time, D.W. was placed with his maternal grandmother.

On September 16, 1999, the State filed a supplemental petition for appointment of a guardian with the right to consent to D.W.'s adoption. The State alleged in the petition, *inter alia*, that respondent: (1) failed to maintain a reasonable degree of interest, concern or responsibility as to D.W.; (2) failed to make reasonable efforts to correct the conditions that were the basis for D.W.'s removal and failed to make reasonable progress toward his return; and (3) had been criminally convicted of the attempted murder of a child. On October 15, respondent signed a specific consent to adoption for her mother to adopt D.W. However, in May 2000, D.W. was removed from respondent's mother's custody because DCFS discovered that respondent's mother allowed unsupervised contact between D.W. and respondent. D.W. was thereafter placed in the custody of a foster mother.

Subsequently, respondent successfully sought to vacate her specific consent to adoption. As a result, on July 25, 2000, the State's September 16, 1999, petition for appointment of a guardian with the right to consent to D.W.'s adoption was reinstated. At first, the State sought to terminate respondent's parental rights based upon the three grounds outlined in its initial petition. However, prior to the fitness hearing, the State withdrew two of the three grounds and proceeded only under section 1(D)(q) of the Illinois Adoption Act (750 ILCS 50/1(D)(q) (West 1998)) based on respondent's criminal conviction for the attempted murder of a child. Following both a fitness and a best interests hearing, detailed below, the juvenile court found respondent unfit pursuant to section 1(D)(q) and that it was in D.W.'s best interests to terminate respondent's parental rights. Accordingly, the trial court entered an order on May 17, 2002, terminating respondent's parental rights.

### Fitness Hearing

The record reveals the following regarding the fitness hearing held

by the juvenile court on May 17, 2002. As stated above, the State attempted to prove that respondent was an unfit parent only under section 1(D)(q) of the Illinois Adoption Act, as amended (750 ILCS 50/1(D)(q) (West 1998)). Under that section, a parent is presumed unfit if the parent "has been criminally convicted of aggravated battery, heinous battery, or attempted murder of any child." 750 ILCS 50/1(D)(q) (West 1998).

The State first called respondent to testify as an adverse witness. Respondent testified that in 1990, she was convicted of attempting to kill her son, D.E. The State then had a certified copy of respondent's 1990 conviction admitted into evidence, which stated that respondent was guilty of attempted first degree murder, and respondent's 1990 indictment, which alleged that respondent was guilty of "intentionally and knowingly" attempting to kill D.E. "by poisoning him by feeding him Pine Sol, in violation of chapter 38, 8—4/38—9—1 of Illinois Revised Statutes, 1985 as amended." Additionally, the State had a disposition order previously entered by Judge Kawamoto, which named respondent as the mother of D.E., admitted into evidence. The State presented no other evidence at the fitness hearing.

Respondent's counsel then called respondent as a witness and attempted to introduce evidence of respondent's rehabilitation efforts since her conviction. The State objected on relevancy grounds, maintaining that under section 1(D)(q), there is no defense of rehabilitation. The State argued that under section 1(D)(q), if there is competent evidence of a respondent's prior conviction for the attempted murder of a child, there is an irrebuttable presumption of unfitness. The trial court initially agreed with the State and sustained the State's objection.

Respondent then argued to the court that its application of section 1(D)(q), *i.e.*, its refusal to allow rehabilitation evidence at the fitness hearing, violated the due process and equal protection clauses of the United States and Illinois Constitutions. The State and the public guardian responded that the trial court's application of section 1(D)(q) was not unconstitutional. In support of their argument, the State and the public guardian cited *In re J.B.*, 328 Ill. App. 3d 175, 765 N.E.2d 1093 (2002), which specifically held that barring rehabilitation evidence from a fitness hearing pursuant to section 1(D)(q) does not violate a parent's equal protection or due process rights.[1]

The trial court then stated that respondent's case was conceivably

---

[1]Our supreme court, in *In re J.B.*, 204 Ill. 2d 382, 789 N.E.2d 1259 (2003), recently dismissed the appeal as moot and vacated this court's decision in *J.B.*, 328 Ill. App. 3d 175.

factually distinct from *In re J.B.* and allowed the rehabilitation evidence at the fitness hearing. Specifically, the trial court stated:

> "I'm going to hear the testimony, regard[ing] rehabilitation. I'm going to hear Miss [L.M.'s] testimony. It is just a matter of am I going to hear it at the unfitness hearing or the best interest hearing.
>
> If I were to wait and hear it only at the best interest hearing, it is possible that the Appellate Court might see this case differently than they saw *JB* and say that is an equal protection problem. Therefore, reverse the finding. If the child were adopted, they would have to undo the adoption. This could all take a couple years, unless it would be an expedited appeal.
>
> On the other hand, I could overrule the objection by the State and Guardian, allow natural Mother to present her evidence of rehabilitation at the unfitness hearing and then make a determination as to whether she's unfit under the statute.
>
> The Court believes that, in fact, this would not overly [*sic*] prejudicial to the State or Guardian, because you must have anticipated she's going to be presenting evidence of her rehabilitation at either the unfitness or the best interest hearing in any event.
>
> The Court, assuming the statute is constitutional, noting depravity is not alleged, has not been alleged in this case, that the only allegation of unfitness that has been acted upon or prosecuted or is being prosecuted by the State in [paragraph] Q [of section 1(D)] is going to, despite the fact that the Appellate Court has in February upheld the constitutionality of Paragraph Q, going to allow the natural mother to offer her evidence of rehabilitation in light of the equal protection argument raised by Mr. Hahn [respondent's attorney], which is, I think, a little bit different than the equal protection argument made in *JB*."

Respondent then testified at the fitness hearing that following her release from prison, she successfully completed her parole. She also testified that she had individual therapy sessions with a psychiatrist for three years after her release from prison and that she went to parenting classes for approximately 10 weeks in 1994 and received a "certificate." Respondent also stated that she was working at a "temp agency" and going to school part-time at "Harold Washington."

Despite respondent's rehabilitation evidence, the trial court found respondent unfit pursuant to section 1(D)(q). Specifically, the trial court stated:

> "The Court will rule as follows: With regard to unfitness, the Court does find that the State has met their [*sic*] burden of proof in this case, which is clear and convincing evidence with regard to Paragraph Q. The State has proved that [respondent] was crimi-

nal[ly] convicted of the attempted murder of a child. There is a certified copy of conviction admitted into evidence.

And [respondent] has herself testified and admitted she was convicted of that crime with regard to her child, [D.E.].

Now, it's been argued now that she's presented testimony sufficient to rebut the presumption of unfitness, that [respondent's] attorney argued [sic] was raised by the State, proving the attempted murder conviction.

I allowed [respondent] to—the opportunity to testify to her rehabilitative efforts, because of the arguments made by Counsel regarding constitutionality of the statute.

It appears to me, first of all, under *[I]n re JB* the statute is constitutional. As applied in this case, I think the Court would have been correct not to allow that testimony. But I'm considering the testimony.

The testimony is that [respondent] successfully completed her parole. While she was on parole she was in individual counseling with a Dr. Kapor. That she also completed parenting classes. She's now working. She would like to have done family counseling. She [did not] do that.

She did do a psychiatric evaluation in 1995 that had a recommendation of counseling.

Under Paragraph I, the depravity paragraph, the rebuttable presumption is that Counsel has argued states or the Legislature states in five, that presumption that a parent is depraved can be overcome only by clear and convincing evidence.

This Court does not believe that there has been clear and convincing evidence presented by [respondent] to overcome the presumption, if this case were brought under Paragraph I, depravity. Had Dr. Kapor come in and testified that he counseled you [respondent] for three years and that based on your progress in counseling he believes that you would not be a risk to your child, that you made sufficient progress, or it wouldn't necessarily be Dr. Kapor that would have to testify. Perhaps somebody else who witnessed what you have done over the years. But all I know is you attempted to kill one of your children.

Subsequent to that, you successfully completed parole. The fact that you did do counseling which ended in '95 and you haven't done any counseling since then, to me, I don't find that you have overcome any presumption of unfitness that's been made in this case. And that's assuming that there is a presumption that would be able to be overcome.

So, the Court is finding, so the record is clear, [that respondent is] unfit pursuant to Paragraph Q of the Adoption Act."

### Best Interests Hearing

After finding respondent unfit, the trial court then proceeded with the hearing regarding D.W.'s best interests. The trial court first heard the public guardian's motion to quash respondent's notice to produce D.W. to testify. In support of the motion, the public guardian had three exhibits admitted into evidence. Exhibit one was a letter written by D.W.'s therapist, Dr. Kimberly Mula of Mount Sinai Hospital, to the public guardian regarding D.W.'s ability to testify. In the letter, Mula stated that D.W. was first referred to her hospital in September 2000 for "treatment of sexual and physical abuse and neglect that occurred while [D.W.] was in the care of his mother and maternal grandmother." Mula further stated that "[r]eports from DCFS and [D.W.'s] own statements indicate[d] that his mother, unknown men, and his brothers were involved in the sexual abuse." According to Mula, D.W. told his foster mother that respondent "put two fingers in his rectum," that a "man put his penis in D.W.'s rectum," that he witnessed "his mother perform oral sex on a man and watched her being spanked by a man," and that he watched "pornographic films and television." Mula further stated in the letter that D.W. "attempted to engage in these behaviors with [his foster mother]."

Mula also stated in her letter that D.W. was diagnosed with post-traumatic stress disorder. According to Mula, D.W. exhibited the following symptoms: (1) smearing feces; (2) sexually reactive behaviors; (3) nightmares; and (4) hypervigilance. Mula also stated that D.W. had been working with her and his foster mother to "learn the difference between good touches and bad touches as well as develop personal safety skills." Mula reported that D.W.'s foster mother indicated that he was "doing very well learning about good touches and [was] working on maintaining appropriate boundaries." Mula expressed concerns in the letter about exposing D.W. to his biological mother and his siblings because reports from DCFS indicated that such exposure could "result in an increase in his symptoms of Post Traumatic Stress Disorder." She noted that after a recent visit with his siblings, D.W. had urinated in a closet. Also, after respondent had called D.W. at his foster mother's home, D.W. was crying because respondent had told him "he had to go home." Further, after respondent's telephone call, D.W.'s foster mother reported that D.W. began making statements that he needed a knife in order to "keep him safe."

Exhibit two was a "Therapy Progress Report," also written by Mula. In the report, Mula stated that in August 2000, when D.W. was visiting with two of his brothers in their foster home, D.W. "tried to insert his penis in his brother's rectum." Also, in September 2000, D.W. reported to his foster mother that respondent had "inserted her

fingers into his rectum and fondled his penis on a daily basis." Mula further stated in the report that D.W. had said that respondent "burn[ed] him with an iron" and "caused a burn mark on his neck."

Additionally, according to the report, when D.W. was first placed in his foster mother's care, he was masturbating and engaging in sexual behaviors with a stuffed animal. D.W. also had nightmares, walked and talked in his sleep, and was enuretic at night. Since he was placed in his foster mother's care, however, D.W. had exhibited many improvements. His speech improved in clarity and was "more age appropriate," he "developed more normal eating behavior," and he "acquir[ed] more skills in self-care." Mula further stated in her report that D.W.'s foster mother indicated that she was feeling increasingly confident in her ability to parent D.W. through adolescence "now that his symptoms of Post Traumatic Stress Disorder [were] decreasing and becoming more manageable."

Mula recommended in her report that D.W. continue therapy and medication management services. She also recommended that D.W. remain in his foster mother's care because he "ha[d] made tremendous improvement since his placement with [her] and he ha[d] developed a strong attachment to her." Mula further stated that D.W.'s removal from his foster mother's care would likely result in "serious psychological harm" and an "escalation of his Post Traumatic Stress symptoms." Mula specifically stated in her report that D.W. "should not be returned to any family member[s] due to their demonstrated inability to protect [him] from harm."

Exhibit three was a "Psychological Evaluation" of D.W. performed by Dr. Ken Fogel at the Center for Personal Development in Chicago. Dr. Fogel noted that D.W. had "markedly poor resources for coping with life's stress," and that he became "easily overwhelmed by complex demands." Fogel further stated that D.W. had "difficulty handling negative emotions, especially fear and loss," and that these feelings "compromise[d] his capacity to integrate information from the world." According to Fogel, D.W. appeared to be "gradually learning to trust in the world around him, but occasionally experience[d] overpowering anxiety about getting his needs met." Fogel concluded that D.W. demonstrated "significant improvement in many areas as a result of therapeutic care, consistent parenting [from his foster mother], and medication management," but that he still had not developed "effective and appropriate mechanisms to manage intense feelings."

Fogel also noted that D.W. appeared to have formed an "adequate and appropriate attachment" to his foster mother in a "relatively brief period of time." Fogel further stated that D.W.'s emotional and

behavioral difficulties could be "exacerbated by uncertainty" regarding the status of his placement. Fogel also noted that in order for D.W. to "move on" in his development, D.W. needed to feel secure about his future placement and caregivers.

The trial court ruled that it was apparent from the exhibits and from Dr. Mula's testimony, detailed below, that D.W. "would be traumatized" if he were required to testify at the hearing. Accordingly, the trial court granted the public guardian's motion and D.W. did not testify at the best interests hearing.

The State's first witness at the hearing was Jennifer Ashenfelter, an adoption specialist who was assigned to D.W.'s case when he was first placed with his maternal grandmother. Ashenfelter testified that D.W. was removed from his grandmother's house because DCFS had cause to believe she was allowing D.W. to have unsupervised contact with respondent. After D.W. was removed from his grandmother's home and placed with a foster mother, DCFS allowed respondent to have supervised visits with D.W. The first visit occurred in May 2000. According to Ashenfelter, respondent was 45 minutes late for this first visit. Another visit occurred in June 2000. Respondent was again late for this visit. In fact, respondent did not arrive for this visit until after the allotted time for which it was scheduled. Another visit was scheduled in July 2000; however, respondent did not show up for this visit. There were also two other visits that were "attempted to be scheduled" after June 2000, but did not occur. After September 2000, the visits with respondent were suspended based on "clinical recommendations" due to D.W.'s "sexually acting out" behavior and his disclosures regarding "sexual abuse." Therefore, according to Ashenfelter, between May 2000 and March 2002, only three visits between D.W. and respondent actually occurred.

Ashenfelter further testified that the three visits between D.W. and respondent "were appropriate." However, after the first visit, D.W. became "extremely aggressive" and was "clinging to the legs of his Mother" as she was attempting to leave on the elevator. After respondent left, D.W. became "very violent" and Ashenfelter and her supervisor had to contain him in a visiting room. D.W. then began to "destroy the room" by knocking things off the shelves, he tried biting Ashenfelter, he kicked Ashenfelter and her supervisor, and he was "tearing things up in the room." Ashenfelter further testified that after the first visit with respondent, when Ashenfelter was driving D.W. back to the foster home, he "unlocked his door and said he was going to jump out and he was going to run."

On cross-examination, Ashenfelter testified that she interpreted D.W.'s "acting out" behavior as "his emotions being extremely high,"

and that he was "unable to control what he was feeling by seeing [respondent]." Ashenfelter also stated that at the end of D.W.'s visits with respondent, "when he was throwing himself at [respondent's] feet and screaming and throwing tantrums," he would say he wanted to go home with respondent. Ashenfelter further testified on cross-examination that, during respondent's May 2000 visit with D.W., she recalled that D.W. was "happy to see his Mother and cousin," that the "children played while [the] birth mother watched," and that respondent "brought a camera and took pictures of [D.W]." According to Ashenfelter, after respondent's June 2000 visit with D.W., D.W. threw a tantrum and said he "didn't want to stay [at the foster home]," and that "he needed to go."

Dr. Mula also testified at the best interests hearing. She stated that she began seeing D.W. because he was exhibiting symptoms of post-traumatic stress disorder, *i.e.*, he was having nightmares, walking in his sleep, smearing feces every time he went to the bathroom, urinating in a closet, masturbating, and acting out sexual behaviors with teddy bears and his foster mother. Mula further stated that between November and December 2001, D.W. revealed to her that an individual he referred to as "Nookie" would "dig in his booty."[2] When Mula asked D.W. what the phrase "dig in his booty" meant, D.W. held up four fingers and stated, "[H]e would put fingers in my butt." Mula also stated that during a family therapy session with D.W.'s foster mother, D.W. took a Cabbage Patch Kid, laid it down on the floor and began "grinding the doll," and stated, "[T]his is what Nookie and Lisa did, acting sexy."[3] According to Mula, D.W. moved about the room, changing positions; first, he would put the doll on top of himself and, then, he would put himself on top of the doll. Mula also stated that D.W.'s foster mother told her that D.W. once said that he was "fondled" by his natural mother and by Nookie.

Mula further testified that D.W. had an IQ of 55, which placed him in the "mild mentally retarded" range. She also stated that D.W. had a speech and language deficit and that he was receiving medication for a post-traumatic stress disorder.

Mula also testified regarding D.W.'s foster mother. According to Mula, D.W.'s foster mother worked on helping D.W. to develop "appropriate limits and boundaries" and to distinguish between "good touches [and] bad touches." D.W.'s foster mother also supervised D.W.

---

[2] Mula later testified that "Nookie" was a "friend of respondent's," and that he was "her paramour."

[3] Mula also stated that D.W. often referred to respondent as "Lisa" in his therapy sessions.

when he went to the bathroom, comforted him when he had nightmares, and was engaged in family therapy sessions with D.W. Mula further stated that D.W.'s home with his foster mother "continue[d] to stabilize" and that his foster mother "worked very hard in order to keep him in a stable home." Mula also stated that D.W. walked with his foster mother and held her hand and that he referred to her as "Mama." When D.W. was in the sessions with Mula, if he did something he wanted his foster mother to see, he would ask if he could "go get her." D.W. "continue[d] to interact" with his foster mother "in a positive way," and his foster mother "respond[ed] to him very appropriately." Mula further stated that she had "never seen [D.W.] interact with [respondent]," and that D.W. had never mentioned "missing her or anything."

Mula concluded that it would not be in D.W.'s best interests to have any contact with respondent because "exposure to someone who potentially was a perpetrator [was] not in anyone's best interest." On cross-examination, Mula admitted that there were no actual court proceedings which indicated that respondent ever sexually abused D.W. and that she, personally, did no investigations regarding D.W.'s implications of sexual abuse. However, Mula stated that based on D.W.'s "disclosures of sexual abuse within the therapy sessions, and the potential risk of harm" to him, she believed it was in D.W.'s best interests "to remain in [the foster mother's care] and that [respondent's] parental rights be terminated."

Ayanna Sims, D.W.'s caseworker, also testified at the hearing. She stated that D.W. was receiving individual therapy to deal with "separation from family issues" and "issues of sexual abuse." Once, after a visit with his siblings, D.W.'s foster mother reported to her that D.W. had urinated in a closet. However, Sims also stated that D.W.'s sibling visit "was appropriate" in her opinion. Sims further stated that D.W. had never expressed to her that he missed his mother or other members of his family. She also stated that she had never talked to D.W. about any sexual abuse issues. According to Sims, D.W. was "bonded to [his] foster parent" and he "referr[ed] to her as Ma on occasion." Sims further stated that it was in D.W.'s best interests that he "be free for adoption." However, Sims noted that D.W.'s foster mother indicated that she was not willing to adopt D.W. at that point due to his "odd behaviors," such as urinating in her closet and smearing feces in the bathroom. According to Sims, D.W.'s foster mother was "just a little hesitant and apprehensive to adopt" D.W. because she was "fearful of what might happen down the line." Sims also admitted that she had never seen D.W. and respondent interact and that her decision that it was in D.W.'s best interests to terminate

respondent's parental rights was not based on "observation between [D.W.] and [respondent]."

Respondent was the final witness to testify at the best interests hearing. She stated that she had never sexually abused D.W., D.W. never "acted out" like Dr. Mula described, *i.e.*, smearing feces, urinating in a closet, etc., prior to his being placed in his foster home, and she "would like nothing more than to have contact with [her] son."

During closing argument, respondent's attorney made the following remarks:

"If this Court believes it is in the best interest to terminate this parent's rights, this Court must believe there was sexual abuse on behalf of the Mother. That is the sole reason this minor was removed, taken to a new home and visitation was stopped."

The trial court disagreed with this argument, stating:

"The argument that the Court must accept, if I'm going to find it is in the best interest of the Minor [D.W.] that [respondent's] parental rights be terminated, the argument that I must accept [respondent] sexually abused the Minor is one the Court does not accept. I don't have to find that [respondent] sexually abused [D.W.] to find it is in his best interest [that] at this time [respondent's] parental rights be terminated.

The Court does find that it is in the best interest of the Minor that [respondent's] parental rights be terminated, based on the evidence I have heard from the witnesses this afternoon. It is not because of necessarily those allegations of sexual abuse. It is based on the best interest factors the Court is obligated to consider set forth in the statute under Section 405 1—3, 4.05.

I am concerned that, and I have considered that[,] the foster parent has not yet expressed or confirmed she wishes to adopt the Minor [D.W.] Nevertheless, the Court does find for this Minor to continue to make progress, this Minor can be free for adoption, so this Minor can have permanency. It is in his best interest parental rights be terminated. That will be on the Court's order."

The trial court then entered an order terminating respondent's parental rights. This appeal followed.

■ Respondent first contends that section 1(D)(q) of the Illinois Adoption Act (Act), as amended (750 ILCS 50/1 (D)(q) (West 1998)), which, *inter alia,* creates an irrebuttable presumption that a parent is unfit if she has been convicted of the attempted murder of a child, violates the due process clauses of the United States and Illinois Constitutions. Specifically, respondent claims that section 1(D)(q) violates due process because it does not permit the trial court to consider such things as the passage of time since the conviction and the ability of a parent to change as a result of parenting classes and individual therapy.

The State and the public guardian initially argue that respondent lacks standing to challenge the constitutionality of section 1(D)(q) because the trial court granted her the very opportunity which she now claims the statute precludes, *i.e.*, the opportunity to present evidence at the fitness hearing regarding her rehabilitation efforts and her willingness and ability to care for her children. Additionally, the State and the public guardian contend that even if respondent has standing to challenge the statute, the statute does not violate due process.

Under section 1(D)(q) of the Act (750 ILCS 50/1(D)(q) (West 1998)), rehabilitation evidence to rebut the presumption of unfitness is not permitted. The section requires a finding of unfitness as a matter of law based only upon a prior conviction of any of the enumerated offenses therein. 750 ILCS 50/1(D)(q) (West 1998). In the instant case, in contradiction of the statute, the trial court improperly permitted respondent to testify at the fitness hearing regarding her rehabilitation efforts since her release from prison in order to rebut the presumption of unfitness. Respondent testified that following her release from prison, she successfully completed her parole. She also testified that she had individual therapy sessions with a psychiatrist for three years after her release from prison and that she had gone to parenting classes for approximately 10 weeks in 1994 and received a "certificate." Respondent also stated that she was working at a "temp agency" and going to school part-time at "Harold Washington." The State and the public guardian here contend that because respondent was improperly permitted to present this evidence during the fitness hearing, she now lacks standing to challenge the statute's constitutionality.

■ In Illinois, standing requires only some injury in fact to a legally cognizable interest. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492, 524 N.E.2d 561 (1988). The injury, whether actual or threatened, must be "distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the relief requested." *Messenger v. Edgar*, 157 Ill. 2d 162, 170, 623 N.E.2d 310 (1993). An individual who challenges the constitutionality of a statute must be within the class of persons as to whom the law is allegedly unconstitutional. *Messenger*, 157 Ill. 2d at 171. That is, one must have sustained, or be in immediate danger of sustaining, a direct injury as a result of enforcement of the challenged statute. *Messenger*, 157 Ill. 2d at 171.

■ In the present case, had the trial court properly applied section 1(D)(q), there is no question respondent would have standing to challenge the statute's constitutionality. Respondent was convicted of the

attempted murder of her child, D.E., and was, therefore, within the class of persons as to whom the statute is allegedly unconstitutional. Further, had the trial court properly applied the statute, respondent would have sustained a direct injury from the enforcement of the statute, *i.e.*, the inability to present rehabilitation evidence at the fitness hearing. Contrary to the State and the public guardian's argument, we do not believe that the trial court's misapplication of the statute deprives respondent of standing to challenge its constitutionality. Because respondent was convicted of the attempted murder of a child, she is still within the class of persons as to whom the statute is allegedly unconstitutional and, as long as respondent has minor children, she is also in danger of sustaining a direct injury as a result of the proper enforcement of the statute. Accordingly, we find that respondent has standing to challenge section 1(D)(q)'s constitutionality.

In regard to the merits of the controversy, respondent contends that section 1(D)(q) of the Act, as amended (750 ILCS 50/1 (D)(q) (West 1998)), is unconstitutional because it violates the due process clause of both the United States and Illinois Constitutions. Respondent argues that the section is not narrowly drawn to promote a legitimate state interest and, therefore, it cannot withstand strict scrutiny. Specifically, respondent maintains that section 1(D)(q) does not permit the circuit court to consider the passage of time and provides no opportunity for a parent to present evidence regarding changes in her circumstances since she was convicted of the charge of attempted murder of a child or regarding her efforts to rehabilitate herself.

The State contends that its interest in protecting minors is "sufficiently compelling" to satisfy strict scrutiny and to uphold section 1(D)(q), as amended. The State specifically argues that where a parent has demonstrated the intent to kill one of her children, coupled with an act in furtherance of that intent, such that she is guilty of the attempted murder of that child, it "clearly has an interest in protecting the remaining children in her care." The State further argues that sufficient safeguards exist such that there is little or no risk of an erroneous deprivation of parental rights. Specifically, the State maintains that the termination hearing process "contemplates and provides [parents] the opportunity to present evidence of the full measure of [their] rehabilitation and conduct at the best interest portion of the hearing."

The public guardian contends that the amendment here does not violate either substantive or procedural due process. With respect to substantive due process, the public guardian argues that the amendment is tailored to express the State's compelling interest in protect-

ing children from parents who have been convicted of the attempted murder of a child even when the parent has shown a propensity to commit such abuse, but has not yet abused the child who is the subject of the termination proceeding. The public guardian maintains, therefore, that a parent's actions, both before and after the birth of a child, are relevant to the protection of the child under the Act. With respect to procedural due process, the public guardian argues that the amendment is not unconstitutional because the established procedures protect the parent as a finding of unfitness is not an automatic termination of parental rights, and the parent may contest the termination of rights at the "best interests" hearing.

■ "All statutes are presumed to be constitutional." *In re R.C.,* 195 Ill. 2d 291, 296, 745 N.E.2d 1233 (2001). The burden of rebutting this presumption and clearly establishing a constitutional violation is on the party challenging the constitutionality of the statute. *R.C.,* 195 Ill. 2d at 296. It is the duty of the court to construe acts of the legislature so as to affirm their constitutionality and validity if it can reasonably do so. *R.W. Dunteman Co. v. C/G Enterprises, Inc.,* 181 Ill. 2d 153, 163, 692 N.E.2d 306 (1998).

■■ Proceedings used to terminate parental rights must meet the requisites of the due process clause. *Santosky v. Kramer,* 455 U.S. 745, 753-54, 71 L. Ed. 2d 599, 606-07, 102 S. Ct. 1388, 1394-95 (1982); *In re M.H.,* 196 Ill. 2d 356, 363, 751 N.E.2d 1134 (2001). The United States Supreme Court has identified three factors to be considered by courts in determining what the due process clause requires: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976); *M.H.,* 196 Ill. 2d at 363. The Supreme Court has applied these factors to cases involving the termination of parental rights. *Lassiter v. Department of Social Services,* 452 U.S. 18, 31, 68 L. Ed. 2d 640, 652, 101 S. Ct. 2153, 2161-62 (1981). The State has two interests in a proceeding to terminate parental rights: (1) a *parens patriae* interest in preserving and promoting a child's welfare, and (2) a fiscal and administrative interest in reducing the cost and burden of such proceedings. *Santosky,* 455 U.S. at 766, 71 L. Ed. 2d at 615, 102 S. Ct. at 1401.

■ A parent's interest in having and raising children is considered a fundamental liberty interest which is protected under "heightened protection" by the due process clause. *M.H.,* 196 Ill. 2d at 362-63.

Both parties agree that because the issue here involves a fundamental liberty interest, when determining whether section 1(D)(q) of the Act, as amended, is unconstitutional as violative of the due process clause, the court must apply a strict scrutiny analysis. The statute, therefore, must be narrowly tailored to promote a compelling state interest.

Respondent basically argues that section 1(D)(q) violates the due process clause because it is not sufficiently narrowly tailored. Specifically, respondent's brief directs our attention to the absence from section 1(D)(q) of a specific time limit during which a conviction for the attempted murder of a child may be considered in a fitness hearing and the absence of an opportunity to rebut the presumption that a parent is unfit based on the existence of such a conviction.

In the extremely few Illinois cases in which a summary determination of unfitness has been upheld, almost all of those cases involved a judgment of unfitness based on the fact that the parent had committed a crime that serves as a *"per se"* factor establishing parental unfitness. In *In re Ray*, 88 Ill. App. 3d 1010, 411 N.E.2d 88 (1980), the respondent was convicted of murder and cruelty to children on evidence of common design and participation in her boyfriend's torture and abuse of the respondent's 17-month-old daughter, resulting in her death. Prior to the respondent's conviction, the State had filed a petition seeking termination of her parental rights as to her three other children. At that time, section 1(D)(i) of the Act provided that a criminal conviction of a parent resulting from the death of any child by physical abuse constituted a ground for finding the parent unfit. Following the respondent's conviction, the State moved for summary judgment, which the trial court granted.

On appeal, the *Ray* respondent argued that the statute violated her equal protection and due process rights. *Ray*, 88 Ill. App. 3d at 1010-11. The respondent also argued that a parent who abuses and kills one child will not automatically mistreat her other children, the causes of such abuse can be treated and eliminated, and the statute imposed an "impermissible 'irrebuttable' or conclusive presumption." *Ray*, 88 Ill. App. 3d at 1014. The *Ray* court rejected this argument, stating that prior Illinois cases had found that the abuse of one child was sufficient to support findings of parental unfitness and termination of parental rights as to the parent's other children. *Ray*, 88 Ill. App. 3d at 1013. The *Ray* court also agreed with the State that the "irrebuttable presumption" challenged by the respondent "is nothing more than the relation between a fact and its legal result," and stated that it failed to see how the statute constituted a presumption in any sense. *Ray*, 88 Ill. App. 3d at 1014.

Respondent contends that *Ray* is distinguishable from the case at

bar because, in *Ray*, the court assessed the constitutionality of the relevant statute under the rational relationship test and not strict scrutiny. However, the *Ray* court specifically found that the relevant statute promoted an "overriding state interest" that withstood constitutional attack under any level of scrutiny. *Ray*, 88 Ill. App. 3d at 1013-14.

In *In re J.H.*, 292 Ill. App. 3d 1102 (1997), the respondent, convicted of the first degree murder of an 11-year-old girl to whom she was not related, appealed the trial court's grant of summary judgment to the State on the State's petition to terminate the respondent's parental rights, finding that the respondent was unfit to be a parent under section 1(D)(f) of the Act. On appeal, the respondent argued that the trial court erred in applying section 1(D)(f) because the victim of her crime was not her own child. *J.H.*, 292 Ill. App. 3d at 1103. The *J.H.* court affirmed the trial court's finding of unfitness, holding that the term "any child" in section 1(D)(f) was clear and that the statute did not require that the abused child be related to the parent for the parent to be found unfit, *i.e.*, a parent's conviction resulting from the death of any child by physical abuse was a ground for finding the parent unfit. *J.H.*, 292 Ill. App. 3d at 1104.

In *In re A.M.F.*, 311 Ill. App. 3d 1049, 726 N.E.2d 661 (2000), the respondent mother took her daughter to the hospital where it was determined that the child's injuries were the result of abuse. The respondent was indicted for aggravated battery of a child, a Class X felony, but she accepted the State's offer of an open plea to aggravated battery, a Class 3 felony. The State subsequently sought to have the respondent declared unfit pursuant to section 1(D)(q) of the Act, the same section involved in the present case, prior to the amendment of the section. The trial court found the respondent unfit and granted the State's motion for summary judgment based on the respondent's conviction for aggravated battery. The respondent had objected, arguing that section 1(D)(q) required a conviction for the specific crime of "Aggravated Battery of a Child" as that offense is defined in the Criminal Code of 1961 (720 ILCS 5/12—4.3 (West 1996)), as opposed to a conviction for aggravated battery " 'of the child who is the subject matter of the proceeding.' " *A.M.F.*, 311 Ill. App. 3d at 1051.

On appeal, the *A.M.F.* respondent further argued that the phrase "aggravated battery of the child," as used in section 1(D)(q), was ambiguous. The *A.M.F.* court rejected this argument, finding that section 1(D)(q) made no reference to the offense of "Aggravated Battery of *a* Child" or to the Criminal Code, and that the legislature intended to find a person unfit when that person is convicted of the "aggravated battery 'of *the* child that is the subject matter of the proceedings.' "

(Emphasis added.) *A.M.F.*, 311 Ill. App. 3d at 1052. The court did not consider the State's alternative argument pursuant to the amendment of section 1(D)(q) at issue in this case, *i.e.,* that the respondent was unfit to be a parent *per se* based on the prior conviction, finding the issue waived because the application of amended section 1(D)(q) had not been raised in the trial court even though the finding of unfitness occurred after the effective date of the amendment. *A.M.F.*, 311 Ill. App. 3d at 1053.

■ In the present case, with respect to substantive due process, it is clear from the Illinois cases cited above that *"per se"* factors for finding unfitness as a matter of law under the Act, such as a conviction for the attempted murder of a child, have been applied in termination of parental rights proceedings and served as grounds for granting summary judgment to the State. Although the interpretation of the relevant statutes was at issue in *J.H.* and *A.M.F.* and not the statutes' constitutionality, the cases make clear that such *per se* factors are not unconstitutional merely because they require a finding of unfitness as a matter of law. Accordingly, we find no basis supporting an argument that a statute, such as section 1(D)(q), violates a party's due process rights merely because the statute requires a finding of unfitness as a matter of law based on a prior conviction involving the attempted murder of a child.

The more difficult issue is whether amended section 1(D)(q) of the Act is sufficiently narrowly tailored to express the State's interest in protecting children from abuse. For example, section 1(D)(i), which we set forth below, creates a rebuttable presumption of unfitness even where the parent has a conviction for murder or multiple felony convictions. Section 1(D)(q) does not permit rebuttal evidence from the parent prior to an unfitness finding. Further, certain convictions for murder, as referenced here in section 1(D)(i), can only be considered if they are entered within 10 years of the State's petition seeking termination of parental rights. Again section 1(D)(q) contains no similar time limit.

In the present case, as argued by the State and public guardian, the State does have a compelling interest in protecting children from persons who have been convicted of the attempted murder of a child, both after and before any such attempt on another child has occurred. The amendment to section 1(D)(q) promotes that interest by allowing courts to consider a parent's conviction for the attempted murder of a child when determining whether the parent is also fit to parent his or her other current or future children. The State does not have to wait for another attempted murder to occur. Additionally, despite a finding of unfitness under section 1(D)(q), a court cannot automatically

terminate a parent's parental rights. A trial court, as here, must also conduct a "best interests" hearing to determine whether it is in the best interests of the child to have a parent's rights permanently terminated. The procedures established by the Act, therefore, do not automatically result in the termination of parental rights following a conviction for one of the offenses listed in section 1(D)(q). Following a finding of unfitness, a parent still possesses the right and opportunity at the "best interests" hearing to present evidence of her rehabilitation and desire and ability to be a parent to her children. Accordingly, we find that such procedures do not violate a party's due process rights.

Respondent maintains, however, citing *In re H.G.*, 197 Ill. 2d 317, 757 N.E.2d 864 (2001), that the fitness hearing and the best interests hearing are two separate proceedings and that it is therefore inappropriate to introduce evidence that serves as "rebuttal to the question of fitness" in the best interests portion of the termination proceedings.

We find that *H.G.* is inapposite to the case at bar. In *H.G.*, the court reviewed the constitutionality of section 1(D)(m—1) of the Act (750 ILCS 50/1(D)(m—1) (West 1998)). That section provided that a parent may be found unfit if, "[p]ursuant to the Juvenile Court Act of 1987, a child has been in foster care for 15 months out of any 22 month period." 750 ILCS 50/1(D)(m—1) (West 1998). That section also allowed a parent to rebut an allegation of unfitness, during the fitness hearing, by proving "by a preponderance of evidence" that it would be in the child's best interests to go home within six months of when the petition for termination was filed. 750 ILCS 50/1(D)(m—1) (West 1998). The *H.G.* court found that section 1(D)(m—1) was unconstitutional since it was not "narrowly tailored to the compelling goal of identifying unfit parents because it fail[ed] to account for the fact that, in many cases, the length of a child's stay in foster care has nothing to do with the parent's ability or inability to safely care for the child but, instead, is due to circumstances beyond the parent's control." *H.G.*, 197 Ill. 2d at 330-31. The fact that the parent was allowed to rebut an unfitness allegation by showing it was in the best interests of the child to return home did not save the statute because, according to the court, introducing the concept of best interests during a fitness hearing might produce an absurd result, *i.e.*, a court could declare a parent "unfit *despite* the court's finding that [the parent] was able to safely care for her child." (Emphasis in original.) *H.G.*, 197 Ill. 2d at 334-35.

The case at bar presents an entirely different scenario than the one in *H.G.* First, unlike the amount of time a child spends in foster

care, it is clear that a parent's conviction for the attempted murder of a child is directly related to the parent's ability to safely care for his or her children and is not due to circumstances beyond the parent's control. Moreover, allowing evidence of a parent's fitness during a best interests hearing would not produce the absurd result present in *H.G.* In fact, our supreme court has specifically held that evidence of a parent's recent circumstances and conduct is appropriate at the best interests phase of the termination proceedings. See, *e.g., In re Davonte L.*, 298 Ill. App. 3d 905, 924, 699 N.E.2d 1062 (1998), *aff'd, In re D.L.*, 191 Ill. 2d 1, 727 N.E.2d 990 (2000).

Respondent also argues that this court must give "meaningful consideration [to] the second *Mathews* factor and the operation of presumptions." Under *Mathews,* as stated above, the second factor that courts must consider when determining whether a statute is unconstitutional is "the risk of an erroneous deprivation of [an individual's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903. Respondent here claims, citing *Stanley v. Illinois,* 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), that this court should more closely consider the second *Mathews* factor because the "risk from the operation of the presumption in section 1(D)(q) is that the court will automatically find a parent unfitness [*sic*] upon proof of conviction without considering the present circumstances showing that the person can be a fit parent." We note that *Stanley* is distinguishable from the case at bar. In *Stanley,* the United States Supreme Court held an Illinois statute, which presumed unwed fathers to be unfit parents, unconstitutional because it found that the presumption was unrelated to the father's actual ability to be a fit parent. *Stanley,* 405 U.S. at 658, 31 L. Ed. 2d at 562-63, 92 S. Ct. at 1216. In contrast, as we have stated above, the presumption in section 1(D)(q) is directly related to the parent's ability to be a fit parent.

Respondent also cites numerous cases in which this court reversed decisions of the trial courts to terminate the respondents' parental rights because the respondents were not afforded a meaningful opportunity to participate in the termination hearing. The cited cases include: *In re Vanessa C.*, 316 Ill. App. 3d 475, 736 N.E.2d 593 (2000); *In re D.R.*, 307 Ill. App. 3d 478, 718 N.E.2d 664 (1999); and *In re C.J.*, 272 Ill. App. 3d 461, 650 N.E.2d 290 (1995). These cases are not applicable to the case at bar. In each case, the respondent was denied the opportunity to testify or to present evidence that she wished to present

during the termination proceedings.[4] In the instant case, respondent testified and was permitted to introduce whatever evidence she wished to present regarding her rehabilitation efforts. Moreover, section 1(D)(q) does not deprive individuals of the opportunity to present rehabilitation evidence during termination proceedings because such evidence may be introduced during the best interests portion of the proceedings. Accordingly, we find that respondent has failed to meet her burden of establishing that section 1(D)(q) of the Act is unconstitutional because it violates due process.

Respondent also contends that section 1(D)(q) of the Act violates the equal protection clause of the United States and Illinois Constitutions because it denies a parent who has been convicted of the attempted murder of a child the opportunity to rebut a presumption of unfitness, while section 1(D)(i) permits parents who have been convicted of offenses such as first degree murder, aggravated criminal sexual assault, and multiple felonies the opportunity to rebut a presumption of unfitness. Respondent argues that a distinction in the punishment given to similarly situated offenders of different but comparable crimes has been found to violate equal protection rights in *Skinner v. State of Oklahoma ex rel. Williamson*, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942). Respondent claims that parents should be allowed to present evidence of their rehabilitation and current ability to care for their children before being found unfit.

The State contends that section 1(D)(q) and section 1(D)(i) of the Act properly make distinctions based on inherent differences in the criminal behavior of individual parents and in the crimes committed by them in order to promote a compelling government interest in protecting children from persons who have been convicted of the attempted murder of a child. The State argues that the offenses listed in section 1(D)(q), in which there is no provision allowing the parent the opportunity to rebut a presumption of unfitness, *i.e.*, aggravated battery of a child, heinous battery of a child, or the attempted murder of a child, all inherently focus on the parent's intentional and knowing abuse of a child. The State contrasts this with the offenses listed in section 1(D)(i), where rebuttal evidence is allowed, which do not neces-

---

[4]In *Vanessa C.*, the trial court barred a parent from presenting any evidence during the termination proceeding as a discovery sanction (*Vanessa C.*, 316 Ill. App. 3d at 478); in *D.R.*, the trial court barred the parent's counsel from participating in the proceeding because the parent failed to appear in court (*D.R.*, 307 Ill. App. 3d at 481); and in *C.J.*, an incarcerated parent was precluded from testifying at the termination proceeding (*C.J.*, 272 Ill. App. 3d at 463).

sarily focus on a parent's intention to hurt a child. For example, the State notes that a conviction may be based on the first or second degree murder of a child's parent where the conviction did not have an actual relationship to the abuse of the child. The State claims that such a distinction is consistent with the purpose of the Act in protecting children from abusers, as opposed to creating punitive measures for criminals. The State concludes, therefore, that respondent is not similarly situated to persons whose felony convictions did not involve the actual abuse of children.

The public guardian adds that section 1(D)(q) does not violate equal protection because, under both section 1(D)(q) and section 1(D)(i), the potential consequences for a parent who is convicted of the attempted murder of a child are the same, *i.e.*, termination of his or her parental rights.

■ The protection provided by the equal protection clauses of the United States and Illinois Constitutions is identical. *R.C.*, 195 Ill. 2d at 309; *In re A.A.*, 181 Ill. 2d 32, 36-37, 690 N.E.2d 980 (1998). The government is required to treat similarly situated individuals in a similar manner. *R.C.*, 195 Ill. 2d at 309. The government, therefore, may not treat differently persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of legislation. *R.C.*, 195 Ill. 2d at 309. "However, the equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people." *R.C.*, 195 Ill. 2d at 309. Courts apply strict scrutiny to classifications affecting fundamental rights. *A.A.*, 181 Ill. 2d at 37. "To survive strict scrutiny in the equal protection context, as in due process analysis, the means employed by the legislature must be necessary to advance a compelling state interest, and the statute must be narrowly tailored to the attainment of the legislative goal." *R.C.*, 195 Ill. 2d at 309. To have standing to raise an equal protection claim, the party raising the claim must be a member of the class against whom the statute allegedly discriminates. *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 460, 687 N.E.2d 1014 (1997).

■ Section 1(D)(i) of the Act, as amended, states:

"(i) Depravity. Conviction of any one of the following crimes shall create a presumption that a parent is depraved which can be overcome only by clear and convincing evidence: (1) first degree murder in violation of paragraph 1 or 2 of subsection (a) of Section 9—1 of the Criminal Code of 1961 or conviction of second degree murder in violation of subsection (a) of Section 9—2 of the Criminal Code of 1961 of a parent of the child to be adopted; (2) first degree murder or second degree murder of any child in violation of the

Criminal Code of 1961; (3) attempt or conspiracy to commit first degree murder or second degree murder of any child in violation of the Criminal Code of 1961; (4) solicitation to commit murder of any child, solicitation to commit murder of any child for hire, or solicitation to commit second degree murder of any child in violation of the Criminal Code of 1961; or (5) aggravated criminal sexual assault in violation of Section 12—14(b)(1) of the Criminal Code of 1961.

There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights.

There is a rebuttable presumption that a parent is depraved if that parent has been criminally convicted of either first or second degree murder of any person as defined in the Criminal Code of 1961 within 10 years of the filing date of the petition or motion to terminate parental rights." 750 ILCS 50/1(D)(i) (West 1998).

Respondent relies primarily on *Skinner* in support of her equal protection argument. In *Skinner,* the Supreme Court reviewed the constitutionality of Oklahoma's habitual criminal sterilization act (Oklahoma Act), which provided for the sterilization of "habitual criminals." Those eligible for the punishment pursuant to the Oklahoma Act were criminals who were convicted of at least three felonies amounting to crimes of "moral turpitude." The statute, however, specifically excluded offenses arising out of the violation of prohibitory laws, revenue acts, embezzlement, or political offenses. *Skinner,* 316 U.S. at 536-37, 86 L. Ed. at 1657-58, 62 S. Ct. at 1111. The *Skinner* petitioner had been convicted of stealing chickens and two subsequent robberies using firearms. The trial and reviewing courts of Oklahoma found that the petitioner should be sterilized pursuant to the Act. The majority of the *Skinner* Court reversed the lower courts' judgments, finding that the statute failed to meet the requirements of the equal protection clause. Upon comparing convictions for grand larceny, punishable under the statute, and embezzlement, which was not punishable, the *Skinner* Court found that the nature of the two crimes was "intrinsically the same" and punishable criminally in the same manner. The *Skinner* Court then concluded:

"When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. [Citations.] Sterilization of those who have thrice committed grand

larceny with immunity for those who are embezzlers is a clear, pointed, unmistakable discrimination." *Skinner*, 316 U.S. at 541, 86 L. Ed. at 1660, 62 S. Ct. at 1113.

Respondent's reliance on *Skinner* is misplaced. *Skinner* involved a statute in which direct criminal punishments were vastly different for similar crimes. Repeat larcenists might be sterilized while repeat embezzlers were completely exempted from the statute. *Skinner*, 316 U.S. at 541, 86 L. Ed. at 1660, 62 S. Ct. at 1113. The allegedly differential treatment in the present case is not of the same nature and extent as it was in *Skinner.*

■ Here, the Act did not create extremely different punishments for different classes of people committing similar offenses. The Act created a method for the State to have a parent declared unfit for the protection of children because of a prior conviction. The Act did not create classifications for administering direct punishment for convictions. Section 1(D)(q) created a *per se* finding of unfitness, while section 1(D)(i) created a presumption of unfitness that may be rebutted. The risk in being convicted of the crimes listed under either of the sections is the same, *i.e.*, the person may ultimately have his or her parental rights terminated by the court because he or she is unfit. Although, from respondent's viewpoint, section 1(D)(q) of the Act is stricter because it requires a finding of unfitness without the opportunity to rebut that finding, the potential consequences are the same under either section 1(D)(i) or section 1(D)(q) for a conviction of one of the listed offenses. Additionally, as stated above, respondent and other similarly situated parents still possess the opportunity to present evidence of their rehabilitation and ability to be a parent at the required "best interests" hearing.

In summary, we find no authority to support respondent's argument that because section 1(D)(i) creates a rebuttable presumption of unfitness, while section 1(D)(q) does not, that there is an equal protection violation. Accordingly, respondent has failed to meet her burden of establishing that section 1(D)(q) of the Act is unconstitutional.

■ Respondent further contends that the trial court erred in finding that it was in D.W.'s best interests to terminate respondent's parental rights because the evidence offered by the State and the public guardian at the termination hearing "did not present the trial court with a complete picture." The State and the public guardian respond that the trial court properly considered the best interests factors outlined in section 1—3(4.05) of the Juvenile Court Act (705 ILCS 405/1—3(4.05) (West 1998)) and correctly concluded that it was in D.W's best interests to terminate respondent's parental rights.

The decision to terminate parental rights rests within the sound

discretion of the trial court. *In re Jeffrey S.*, 329 Ill. App. 3d 1096, 1101, 769 N.E.2d 1114 (2002). Accordingly, a trial court's best interests finding will not be disturbed on appeal unless there was an abuse of discretion. *Jeffrey S.*, 329 Ill. App. 3d at 1101.

In the present case, the trial court was required to consider the following factors in deciding whether to terminate respondent's parental rights in regard to D.W.:

    (1) the physical safety and welfare of D.W., including food, shelter, health, and clothing;

    (2) the development of D.W.'s identity;

    (3) D.W.'s familial, cultural, and religious background and ties;

    (4) D.W.'s sense of attachments, including:

        (a) where D.W. actually feels love, attachment, and a sense of being valued;

        (b) D.W.'s sense of security;

        (c) D.W.'s sense of familiarity;

        (d) continuity of affection for D.W.;

        (e) the least disruptive placement alternative for D.W.;

    (5) D.W.'s wishes and long-term goals;

    (6) D.W.'s community ties, including church, school, and friends;

    (7) D.W.'s need for permanence which includes his need for stability and continuity of relationships with parent figures and with siblings and other relatives;

    (8) the uniqueness of every family and child;

    (9) the risks attendant to entering and being in substitute care; and

    (10) the preferences of the persons available to care for the child.

705 ILCS 405/1—3(4.05) (West 1998).

A thorough review of the record indicates that, in fact, the trial court considered the above factors. At the best interests hearing, the trial court reviewed the following evidence: (1) Dr. Mula's May 14, 2002, letter to the public guardian regarding D.W.'s ability to testify at the termination proceedings; (2) Dr. Mula's "Therapy Progress Report" on D.W.; (3) Dr. Fogel's "Psychological Evaluation" of D.W.; (4) Ashenfelter's testimony; (5) Dr. Mula's testimony; (6) Sims' testimony; and (7) respondent's testimony. The exhibits and the witnesses, with the exception of respondent, suggested that in order for D.W. to continue with his progress in overcoming his psychological and developmental problems, including his post-traumatic stress disorder, he should remain in his foster mother's care and that respondent's parental rights should be terminated. Although respondent claims that the State and the public guardian's evidence did not present a "complete picture" to the trial court, respondent points to no evidence, offered by any of the parties, that the trial court should have

considered, but did not. In fact, in respondent's brief before this court, she only reiterates the same facts made known to the trial court during the termination proceeding—facts that were considered by the trial court in rendering its ruling.

Respondent also contends that the trial court abused its discretion by "discounting the allegation[s] of sexual abuse" and by not considering "how [the] allegation[s] impacted the agency's handling of the case." Respondent argues, citing *In re H.C.*, 305 Ill. App. 3d 869, 713 N.E.2d 785 (1999), that because D.W. was taken out of his maternal grandmother's home due to D.W.'s unsubstantiated disclosures of sexual abuse, the trial court was obligated to give respondent the opportunity to "correct the conditions" that caused his removal before terminating respondent's parental rights.

Respondent's argument fails for two reasons. First, the record reveals that D.W. was taken out of his maternal grandmother's home not only because of disclosures of sexual abuse, but also because his maternal grandmother was allowing unsupervised contact between D.W. and respondent. Second, as discussed below, even if D.W. were removed solely due to allegations of sexual abuse, the trial court was not required under *H.C.* to give respondent the "opportunity to correct" the conditions that led to D.W.'s removal before terminating respondent's parental rights.

The *H.C.* court held that before a parent can be declared unfit under section 1(D)(m) of the Illinois Adoption Act (750 ILCS 50/1(D)(m) (West 1996)), the parent must be given the opportunity to "make reasonable efforts to correct the conditions that caused the removal of the [child]." *H.C.*, 305 Ill. App. 3d at 877. Because the record in *H.C.* clearly showed that the respondent made reasonable progress toward the return of her children, this court reversed the trial court's finding that the respondent was unfit. *H.C.*, 305 Ill. App. 3d at 877. In the present case, however, the trial court found that respondent was unfit pursuant to section 1(D)(q), *not* section 1(D)(m) as in *H.C.* Section 1(D)(q), as stated above, creates an irrebuttable presumption of unfitness if a parent has been convicted of the attempted murder of a child, as was the respondent in the instant case. Once respondent was declared unfit, the trial court was obligated in the best interests hearing to consider the evidence in light of the factors enumerated in section 1—3(4.05) of the Juvenile Court Act (705 ILCS 405/1—3(4.05) (West 1998)). *In re D.H.*, 323 Ill. App. 3d 1, 13, 751 N.E.2d 54 (2001). As discussed above, the record makes clear that the trial court properly considered all the evidence, including respondent's testimony regarding her rehabilitation, in light of these factors.

58

Respondent's final contention is that because D.W.'s foster mother indicated that she was not yet willing to permanently adopt D.W., the trial court abused its discretion in terminating respondent's parental rights. However, it is well settled that the absence of an adoptive home is only one factor to consider in deciding whether to terminate parental rights. See, *e.g.*, *In re Tashika F.*, 333 Ill. App. 3d 165, 170, 775 N.E.2d 304 (2002). Accordingly, we hold that the trial court did not abuse its discretion in finding that it was in D.W.'s best interests to terminate respondent's parental rights.

For the reasons stated, we affirm the order of the circuit court terminating respondent's parental rights.

Affirmed.

CAHILL and McBRIDE, JJ., concur.